BECK LAW OFFICES
Larry Beck
8884 North Government Way, Suite D
P.O. Box 1390
Hayden, ID 83835-1390
Telephone:  (208) 772-4400
Facsimile:  (208) 772-7243
larry@becklawidaho.com
Idaho State Bar No. 3751
Attorney for Plaintiff

| | |
|---|---|
| LEE J. PLAINTIFF and CAROLYN P. PLAINTIFF, husband and wife,<br><br>　　　Plaintiffs,<br><br>　　　v.<br><br>CITY OF COEUR D'ALENE, IDAHO, A municipal corporation and political subdivision of the State of Idaho,<br><br>　　　Defendant. | **Case No.: 2:21-cv-00073-DKG**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**COME NOW** the above entitled Plaintiffs, LEE BRAINARD AND CAROLYN

BRAINARD, husband and wife, by and through their attorney of record, Larry Beck of Beck

Law Offices, Hayden, Idaho, and hereby submit their Memorandum of Points and Authorities in

Opposition to Defendant's Motion for Summary Judgment.

## FACTUAL BACKGROUND

Plaintiffs hereby incorporate, as if fully set forth below, Plaintiffs Statement of Disputed

Facts in Opposition to Defendant's Motion for Summary Judgment, the Declaration of Lee J.

Brainard, and the Declaration of Larry Beck and exhibits attached thereto, all either previously or

contemporaneously filed herein.

**LEGAL STANDARD**

In deciding whether to grant a defendant's motion for summary judgment, the trial court must determine from the record whether "a fair minded jury could return a verdict for the plaintiff on the evidence presented." *See United Steelworkers of Am. v. Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir. 1989) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (U.S. 1986)). Further, the Ninth Circuit has held that in order to defeat a defendant's motion for summary judgment, the plaintiff only needs to present evidence from which a jury "might return a verdict in his favor". *See id.* (*citing Anderson*, at 257) If from such evidence presented by the plaintiff a jury could reasonably find <u>either</u> that the plaintiff proved his case or that he did not, <u>summary judgment must be denied</u>. *See id.* (*citing Anderson*, at 254). The Ninth Circuit, in adopting the standards laid out in *Anderson* further articulated the role of the trial court in hearing a defendant's motion for summary judgment. *Anderson* held that the trial court must keep in mind that "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from facts *are jury functions*, not those of a judge." *United Steelworkers of Am.*, at 1542 (*citing Anderson*, at 255). (Emphasis added).

When deciding a motion for summary judgment, the court is to construe the facts and evidence in the light most favorable to the nonmoving party in determining whether there are any genuine issues of material fact. *See Delta Savings Bank v. United States*, 265 F.3d 1017, 1021 (9th Cir. 2001). The Ninth Circuit has further added that "an inference as to another material fact may be drawn in favor of the nonmoving party…if it is "rational" or "reasonable"". *United Steelworkers of Am.*, at1542 (*citing T.W. Electrical Service v. Pacific Electrical Contractors*, 809 F.2d 626, 631 (9th Cir. 1987)). Of course it is not necessary for Plaintiff to establish or *prove* its

claims in order to defeat Defendant's Motion for Summary Judgment. If there are genuine issues of material fact with respect to the plaintiff's claims, then <u>Defendant's Motion must be denied</u>.

## ARGUMENT

**A. Plaintiffs can establish a claim for the violation of Plaintiff's procedural due process rights. There are enough facts to establish that Plaintiff suffered intolerable working conditions egregious enough that a reasonable person would feel compelled to resign. Furthermore, Plaintiff can establish a *Monell* claim.**

42 U.S.C. §1983 is an act of Congress meant to provide a remedy for the violation of rights, privileges, and immunities in the Federal Constitution by official government actors' abuse of responsibilities and privileges. *Monroe v. Pape*, 365 U.S. 167, 172 (1961). Municipalities may be subject to liability for constitutional violations under §1983 when the violation arose from official municipal policy or the acts and decisions of a municipal official with final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).

Plaintiffs may bring actions under §1983 for violations of procedural due process by showing that a deprivation of a life, liberty, or property interest occurred, *Cleveland v. Bd. Of Educ. V. Loudermill*, 470 U.S. 532, 541 (1985), and that the procedural safeguards accompanying the deprivation were not constitutionally adequate. *Zinermon v. Burch*, 494 U.S. 113, 126 (1990). The main crux of procedural due process protection is to provide assurance through procedural safeguards that deprivations resulting from government actions do not occur in violation of the Federal Constitution. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). Employment is one of the many categories of government benefits that the United States Supreme Court has recognized as a protected property interest. *Loudermill*, 470 U.S. at 538-39. Public employees may not be deprived of their property interest in continued employment without first being provided notice and a constitutionally adequate hearing. *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972). A public employee may allege that they were deprived of their property interest in continued

employment through a constructive discharge theory by proving the elements of a constructive

discharge. *See Knappenberger v. City of Phoenix*, 566 F.3d 936, 940 (2009).

    **1.  Plaintiff was constructively discharged from his position at the city because Chief White, through his repeated disciplinary and adverse actions, along with retaliatory conduct, created intolerable working conditions, and the city failed to take appropriate action against Chief White and stop the retaliation.**

"Constructive discharge occurs when, "looking at the totality of the circumstances, 'a

reasonable person in [the employee's] position would have felt that he was forced to quit because

of intolerable and discriminatory working conditions.'" *Wallace v. City of San Diego*, 479 F.3d

616, 625 (9th Cir. 2007) (citing *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.

1987) (alteration in the original)). The Ninth Circuit has consistently held that the inquiry for

whether adverse actions and working conditions amount to those sufficient for constructive

discharge claim is "when the working conditions deteriorate, as a result of discrimination, to the

point they become sufficiently extraordinary and egregious to overcome the normal motivation

of a…reasonable employee to remain on the job…." *Poland v. Chertoff*, 494 F.3d 1174, 1184

(9th Cir. 2007).

    Although isolated incidents of mistreatment do not rise to the level of discriminatory

treatment needed for a constructive discharge claim, proof of "aggravating factors such as a

continuing pattern of discriminatory treatment" will support the assertion that an employee's

resignation or retirement was a constructive discharge. *See Huskey v. City of San Jose*, 204 F.3d

893, 900 (9th Cir. 2000). Furthermore, the Ninth Circuit has consistently considered factors such

as being encouraged to resign or retire, having work duties taken away, and being disciplined, as

weighing in favor of finding an employee was constructively discharged; however, **no single

factor is dispositive, and other factors may have some weight.** *See Thomas v. Douglas*, 877

F.2d 1428, 1434 (9th Cir. 1989), *Schnidrig v. Columbia Mach.*, 80 F.3d 1406, 1412 (9th Cir.

1996), *Huskey v. City of San Jose*, 204 F.3d 893, 901 (9th Cir. 2000), *Kortan v. California Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000), *Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1184 (9th Cir. 2005). **The test requires "looking at the totality of the circumstances.**" *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990) (emphasis added).

This is not a case where there was only one isolated instance of a single event, or even just a few instances. Here, Plaintiff has shown that these behaviors, which are retaliatory and abusive in nature, *were continuous over the course of at least nine months and formed a pattern*.

The Ninth Circuit has found that there are enough aggravating factors for a trier of fact to reasonably find constructive discharge occurred when the employee 1) was singled out for a notice of potential relative rule violation, 2) was accused of inadequate job performance with accusations that were inaccurate, and previous evaluations of performance were excellent, 3) was subjected to harassment for several days, and 4) had supervisory duties taken away. *Watson*, 823 F.2d at 361-62. In *Watson*, the court ultimately held that the facts the plaintiff cited to support the above allegations were enough to allow the case to survive summary judgment on the question of whether a constructive discharge occurred. *Id.* at 362. Moreover, being subjected to a pattern of harassment by a supervisor over a longer period of time has also been considered an aggravating factor sufficient for a constructive discharge claim to survive summary judgment when the employer did nothing to stop the harassment. *Sorensen v. City of Caldwell*, 692 F. App'x 832, 834 (9th Cir. 2017).

Other circuits have also found that having job duties taken away and being subjected to a pattern of harassment from co-workers or supervisors, where the employer did nothing to stop the harassment, can also constitute aggravating factors to demonstrate that there are enough material facts to preclude summary judgment on a constructive discharge claim. *Stamey v. Forest*

5

*River, Inc.*, 37 F.4th 1220, 1225-26 (7th Cir. 2022) (held that there were enough facts to demonstrate employee was constructively discharged when co-workers targeted him with a campaign of harassment by repeatedly making offensive comments), *Parrett v. Connersville*, 737 F.2d 690, 694 (7th Cir. 1984) (held that taking job duties away from a professional career employee can be found to have created intolerable working conditions), *Sacks v. Tex. Southern Univ.*, 83 F.4th 340, 347 (5th Cir. 2023) ("badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation" and "offers of early retirement" are examples of aggravating factors to consider in conducting a constructive discharge analysis).

The alleged discriminatory and retaliatory actions Plaintiff suffered from Chief White are similar to those in *Watson, supra.* Here, Plaintiff had job duties taken away from him by Chief White because Chief White was having work meetings with the patrol division's sergeants and lieutenants without Plaintiff, and also didn't notify Plaintiff of the meetings even though he was the Patrol Division Captain. Plaintiff also wasn't notified about what decisions were made in these meetings, which ultimately affected how the patrol unit operated. Because White was meeting with Patrol Division supervisors without informing Plaintiff of the meetings and the results of the meetings, Plaintiff was stripped of several important job duties that were key to his position as Patrol Captain. D*ecl. Brainard*, ¶ 44. Further, Plaintiff was given a performance evaluation with a very negative narrative in December 2019, despite having received the highest performance ratings available from Chief White in his last two prior evaluations. SOF ¶¶ 23(D), (E), (F). Plaintiff was also put on a performance improvement plan (PIP), despite Chief White denying that he did so, and despite White being told not to place Plaintiff on a PIP by Tymesen and Tosi. The PIP that White read to Plaintiff  was based on charges of substandard performance that were either vague, overblown, inaccurate or completely fabricated. SOF ¶ 62 and 70. These

actions, when taken together with the aggravating factors that Chief White was continuously criticizing Plaintiff's job performance (with often fabricated allegations), are very similar to the facts in *Watson*. (See: *Decl. Brainard* ¶s 13-16, 18-40). Plaintiffs assert that they have put forth sufficient facts for the Court to deny Defendant's motion for summary judgment on the issue of whether Plaintiff was constructively discharged from his employment by August 19, 2020.

Further, after Defendant, through city administrator Troy Tymesen, Mayor Widmyer, and the city council, refused to discipline Chief White in any manner whatsoever after reviewing Kirt Naylor's reports, it was then clear to Plaintiff that Defendant failed to protect him from further retaliation from Chief White. After the August 18th city council meeting, where the council, mayor and city administrator refused to discipline Chief White for his retaliation against Plaintiff, both Plaintiffs discussed that because of Chief White's continuous acts of retaliation and harassment, Plaintiff had no choice but to retire. *Decl. Brainard ¶ 57.* That is why Plaintiff met with the city staff the next morning on August 19th, 2020, and told them that he could not physically and mentally take the retaliation any longer and he had no choice but to retire. *Id., and Depo Tr. Lee J. Brainard Vol II*, 290-94. That is also when City Attorney Mike Gridley told Plaintiff that he wanted to put him on paid administrative leave because he didn't want to send him back into a hostile work environment and have to explain that to a jury later on.  Decl. *Brainard ¶55, Depo. Tr. Lee Brainard, Id.*

In addition to the above cited Ninth Circuit case law, the Seventh and Fifth Circuits (consistent with the Ninth Circuit) have emphasized that a continuing campaign of harassment can constitute an aggravating factor, in addition to attempts to get the employee to retire early. *See Stamey*, 37 F.4th at 1225-26, *Sacks*, 83 F.4th at 347. Here, Plaintiffs have presented substantial facts to demonstrate that Plaintiff was subjected to a long and continuing campaign of

harassment from Chief White, whereby Chief White criticized Plaintiff's job performance through unfair and oftentimes fabricated allegations of poor performance, actively looked for reasons that Plaintiff could be disciplined, made false accusations about Plaintiff's job performance, made comments on multiple occasions encouraging Plaintiff to take early retirement, and made an insulting comment about Plaintiff's grandchild as looking like he had downs syndrome. Since the Court must consider the totality of the circumstances, these aggravating factors must be combined with the 2019 downgraded performance evaluation, being excluded from his own division's work meetings, having important job duties being taken away, placing Plaintiff on a completely contrived PIP, and forcing Plaintiff to retire but also to be placed on a paid administrative leave. The Ninth Circuit has held that being placed on a paid administrative leave can constitute an adverse action. *Dahlia v. Rodriguez,* 735 F.3d 1060, 2013 U.S. App. LEXIS 17849. Here, being placed on paid administrative leave constituted an imposition of a burden because it prevented Plaintiff from furthering his command level experience, due to the fact that Defendant couldn't (or wouldn't) stop White from harassing and retaliating against Plaintiff. *Decl. Brainard* ¶ 55. When taken together, there are enough material issues of fact in the record to preclude summary judgment.

Defendant has cited multiple cases in their Memorandum in Support of Motion for Summary Judgment where they have compared those decisions to the facts in this case and concluded that Plaintiffs cannot demonstrate enough facts to show that Plaintiff was constructively discharged. However, these cases are distinguishable on the facts when taken together.

In *Poland*, the Ninth Circuit found that the plaintiff was not constructively discharged as a matter of law because the plaintiff had not even testified that he felt compelled or forced to

resign. 494 F.3d at 1186. In addition, the defendant introduced testimony that all Customs Service special agents signed waivers that allowed them to be transferred anywhere for the good of the agency. *Id.* at 1185. These were important factors that weighed heavily into the holding of *Poland*, because the plaintiff's contention was that being transferred to a new location would end his career since the move would require him to be away from his family. *Id.* at 1186. Furthermore, the plaintiff in *Poland* continued to work in his position for an additional five months after being transferred to the different locations. *Id.* at 1185. The court held that, taken together, the facts did not establish as a matter of law that Plaintiff was constructively discharged because working conditions were not "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood." *Id.* at 1186 (quoting *Brooks*, 229 F.3d at 930).

The record here contains substantial evidence to establish several questions of material fact as to whether Plaintiff was constructively discharged. Plaintiff has testified that he was subjected to working conditions that were so intolerable that a reasonable person in his position would feel compelled to resign. Defendant's own outside investigator and lawyer, Kirt Naylor, found that White's repeated conduct of seeking out, and even fabricating, performance deficiencies in Plaintiff, supported a claim of retaliation. *PSOF ¶65 and 66*. The facts in *Poland* are nowhere near as egregious as what Plaintiff was subjected to: a significantly downgraded performance evaluation, being put on a PIP for contrived alleged performance deficiencies, being pressured to retire early, losing important job responsibilities, dealing with inappropriate comments from Chief White, and a pattern of unwarranted and often fabricated criticisms for the purpose of trying to find reasons to discipline Plaintiff to get him to retire or quit, ultimately forcing Plaintiff to involuntarily retire and be placed on administrative leave. *PSOF ¶58, 88 and*

*62. Decl. Brainard ¶57.* Finally, the City's only option for Plaintiff after the August 18, 2020 City Council meeting, was to place him on an administrative leave to protect him from further retaliatory treatment by White. However, even then, and after months of Plaintiff complaining to Defendant about the retaliation he was suffering from by White, and after reviewing Naylor's reports, Defendant never took any disciplinary action against White at all. *PSOF ¶83.* Plaintiff had no choice but to retire and avoid any further physical and emotional distress. *PSOF ¶58. Decl. Brainard at 57.*

Although *Schnidrig* had some similar facts to Plaintiff's case, the plaintiff in *Schnidrig* **had not been encouraged to resign or retire, did not receive a steeply downgraded performance review, was not placed upon a PIP, did not have job duties taken away, was not shunned, and was not placed on administrative leave.** *Schnidrig*, 80 F.3d at 1412 (emphasis added). In *Schnidrig,* the plaintiff alleged he was constructively discharged for filing a complaint with the EEOC. *Id.* at 1409. Specifically, the alleged retaliatory actions included: 1) someone else getting a raise while he didn't while plaintiff worked the same position, 2) being excluded from one meeting, 3) other executives were instructed not to talk with the plaintiff about certain things, 4) being moved to a smaller office, 5) being replaced in his position with someone younger, and 6) not being given a new position. *Id.* at 1411. The court ultimately found that the plaintiff had not proven that his working conditions were "so intolerable and discriminatory that a reasonable person would feel forced to resign." *Id.* at 1412. Furthermore, the court noted that the defendant had offered legitimate nondiscriminatory reasons for the actions the plaintiff complained about. *Id.* at 1412 (emphasis added).

Plaintiffs also note that Defendant cites *Hardage* in support of the assertion that the Ninth Circuit has established that sexual harassment, receiving an adverse performance memoranda,

and being subject to snide remarks, are not egregious enough to show constructive discharge, but the Ninth Circuit in *Hardage* did not hold that constructive discharge did not occur because these were the alleged adverse actions. Rather, in *Hardage*, the court found that the plaintiff was not constructively discharged because **the plaintiff did not resign until five months after the harassment ceased** and the **defendant presented legitimate, non-retaliatory reasons for finding the plaintiff insubordinate.** *Hardage*, 427 F.3d at 1184-85 (emphasis added). Thus, it would seem that Defendant misrepresents the holding in *Hardage*, as the *Hardage* court never held that sexual harassment, receiving a negative performance memorandum, and snide remarks were not enough to be considered egregious for purposes of finding constructive discharge.

Defendant cites *Brooks v. City of San Mateo*, a case where constructive discharge was not even a main claim. *See Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("Brooks alludes briefly in her moving papers to a constructive discharge theory…"). Even if *Brooks* is relevant to the assertions in Defendant's motion, the factual context is completely different. In *Brooks*, the plaintiff asserted in her retaliation claim that her workplace was different when she returned after six months of leave because other co-workers shunned her because she filed a complaint that caused another co-worker to be terminated for harassment. *Id.* at 928. Further, her evidence of retaliation by the defendant employer also included having trouble getting desired shifts and needing to work with someone who had been close to the co-worker who harassed her. *Id.* The court quickly disposed of the constructive discharge issue in a small section at the end of the opinion, holding that constructive discharge had not occurred because the scheduling conflicts, being shunned by co-workers, and seeing a photo of the terminated co-worker in the dispatch center album, were not egregious when taken together. *Id.* at 930.

Defendant also cites *Steiner v. Showboat Operating Co.* as support for their position that constructive discharge did not occur in the case at bar. *However, one major factual distinction includes that the plaintiff's harasser in Steiner, supra, was terminated two and a half months prior to the alleged constructive discharge.* 25 F.3d 1459, 1465 (9th Cir. 1994). (Emphasis added). The only other alleged retaliatory conduct that the plaintiff alleged occurred was a slightly unfavorable performance evaluation and one incident with a manager, which the court noted the plaintiff offered no proof that the incident was conducted in a retaliatory or discriminatory manner. *Id.* at 1466. Here, Plaintiff has established facts to show that White's retaliatory and harassing conduct occurred shortly after Plaintiff blew the whistle on Hagar, and very close in time after White and Hagar received their letters of expectations from Defendant. *PSOF ¶ 23A and F, 58 and 62.*

Other constructive discharge cases cited in Defendant's brief are also distinguishable. In *Thomas*, the court found that constructive discharge had not occurred as a matter of law because no aggravating factors were present in addition to the plaintiff's subjective discomfort that showed the defendants were responsible for causing that discomfort. *Thomas*, 877 F.2d at 1434. It is also important to note that, in *Thomas*, the plaintiff wanted to be transferred to a different work location — which the defendants denied — because he felt as though it was *possible* he could be retaliated against by the officers that he blew the whistle on. *Id.* at 1430 (emphasis added). And in *King v. AC & R Advertising*, the court found that the plaintiff could not prove constructive discharge occurred as a matter of law because being changed to an at-will employee, having responsibilities reduced, and being put on a different compensation structure, alone, are not enough to show that working conditions were so intolerable that a reasonable person would be forced to resign. *King v. AC & R Advertising*, 65 F.3d 764, 768 (9th Cir. 1995). **Rather, the**

*plaintiff needs to show that there was a "continuous pattern of harassment or aggravating conditions." See Id.* (Emphasis added).

In the case at bar, Plaintiff Plaintiff was subjected to continuous retaliatory working conditions following his blowing the whistle on Hagar and following White and Hagar having received letters of expectation from Defendant, including the following:

1. Plaintiff was excluded from meetings with lieutenants over matters in the patrol division, the division he was supposed to be in charge of as a captain. This effectively removed a host of job duties from Plaintiff, which he could no longer properly perform as a result of being excluded from and not informed about these meetings. *Decl. Brainard ¶44.*

2. On June 3, 2020, Plaintiff was given a PIP/ letter of expectations with false accusations from Chief White about Plaintiff's Plaintiff job performance. In the meeting going over this PIP, Plaintiff objected to every false accusation and provided explanation after White read from the document. Furter White had been instructed by Tosi and Tymesen to not give Plaintiff a PIP. *PSOF ¶70.*

3. Plaintiff's November 2019 performance evaluation had worse ratings in several categories than his prior evaluations had because of fabricated information from Chief White, which Chief White included in the comments area. Plaintiff objects to the fabricated information. *PSOF 23D-F.*

4. Chief White, on multiple occasions, either directly or through Lieutenant Schmitz, attempted to convince Plaintiff to take early retirement, even though that early retirement was already known not to be beneficial for the city. *PSOF 67.*

5. Chief White made an inappropriate comment about Plaintiff's healthy appearing grandson as being a "down-syndrome" kid. *Decl. Brainard ¶49.*

6.

7. On June 2, 2020, one day before the PIP meeting, Chief White set up Plaintiff to see if Plaintiff would tell him about a jail assault allegation that had occurred earlier that day, and was almost immediately found to be bogus. Chief White pretended not to know about it, even though Captain Hagar had told him about it around noon that day and that the complaint was bogus. Plaintiff told White about the bogus complaint having been made around 5 pm that day in a meeting with White and two lieutenats. White acted as though he did not already know about the matter and yelled at Plaintiff for "waiting too

long to inform him about a serious allegation," (even though White had been informed of the matter at noon that day from Hagar and they knew it was a bogus complaint. Brainard also had learned earlier in the day that Hagar had informed White about the complaint and that it was bogus. *PSOF ¶49.*

8.  Chief White engaged in a pattern of providing completely unwarranted criticisms about Plaintiff's actions as a captain in performing his duties. These included: criticism on the post Plaintiff made about a runaway child being located, criticism about sending an officer down to inform fire chief Kenny Gabriel that his grandson had passed away, criticism about how Plaintiff handled a mitigation meeting with an officer, including making false allegations about how Plaintiff had handled it, and unfair criticism about practical jokes Plaintiff played on others in the department in keeping with the normal work environment in the department (which White typically  endorsed through his philosophy of "Funny trumps Wrong!"), when the people who were on the other end of the jokes knew they were jokes and went along with it. *PSOF at ¶ 25-52. Decl. Brainard ¶ 13-27.*

9.  Chief White went around trying to find negative information about Plaintiff that he could use to justify taking disciplinary action against Plaintiff. *PSOF ¶ 40.*

10. Chief White restricted who Plaintiff could communicate with. *Decl. Brainard ¶ 44.*

The evidence on record reflects that, in Chief White's nine-month campaign of retaliation and harassment toward Plaintiff, White made unsubstantiated criticisms of Plaintiff's performance on multiple occasions (including on a performance evaluation), tried to put Plaintiff on a PIP due to largely unsubstantiated and contrived allegations, pressured Plaintiff— directly or indirectly— to retire early on at least 3-4 occasions, despite his early retirement not being beneficial for the city; went around looking for information about Plaintiff to strengthen his case against him, made inappropriate comments to Plaintiff when they were uncalled for, and effectively ensured Plaintiff could not properly conduct his job duties by excluding him from meetings that he needed to be part of in order to fulfill his main job responsibilities, and by limiting who Plaintiff could communicate with in the city and in outside agencies. Taken together, the narrative from these facts establish continuous patterns of discriminatory and

retaliatory conduct, alongside and including, a downgraded performance evaluation, pressure from Chief White to retire early, placing Plaintiff on a PIP, and ultimately forcing Plaintiff to retire and be placed on an administrative leave. Defendant has not offered any evidence that Chief White's actions against Plaintiff were conducted for legitimate, nondiscriminatory reasons.

Furthermore, *White was not terminated or disciplined in any manner at all* for his retaliatory and discriminatory conduct, even though city managers responsible for Chief White's discipline and/or termination knew that Kirt Naylor's investigative report concluded Chief White retaliated against Plaintiff for participating in a protected activity. *Decl. Beck, Exhibit 26.* Plaintiff gave the city every chance to rectify the situation and stop the retaliation, even by waiting until after the city council meeting on August 18, 2020 before meeting with city managers on August 19, 2020 and advising them that he couldn't take the retaliation anymore and he had to retire. *PSOF ¶ 83-88.*

There have been several questions of material fact placed into the record regarding whether Plaintiff was subjected to conditions so intolerable that a reasonable person in his position would feel compelled to resign or retire. None of the cases cited by Defendant contain as many adverse actions as what Plaintiff was subjected to, and the deficiencies in the facts that the Ninth Circuit found in cases where constructive discharge didn't occur, do not exist here. Furthermore, Defendant seems to present the decisions in the cases cited as if the court decided that those individual adverse actions can *never* support a constructive discharge, even when taken together with other adverse actions. However, in those decisions the court simply found that *certain* adverse actions *standing alone* cannot amount to constructive discharge. Defendant's assertion that Plaintiff represented he would not continue working at the police department "irrespective of any measures the city might take to address his concerns" is a complete and total

misrepresentation of the facts, <u>at best</u>. Defendant cites their SOF ¶¶ 82-83 in support of that assertion; however, ¶ 82 only contains a very vague and confusing statement which Defendant claims Plaintiff said to Naylor during his interview:

> "Regardless of how this investigation turns out—I, so one of my concerns that I've expressed as being the face that my agency puts on. If Lee White's employment is terminated through this case, if he stays, I can't stay. If he goes, I can't. You know, I'm, I'm concerned about what he's already doing, the narrative that he's already controlling, and so *I have started looking at the option of retiring*. I reached my retirement points the first of June. *I had intended for another four to six years at this agency, but I genuinely do not see how I can remain employed at the police department after this.* And so, I have, I have initiated dialogue with individuals outside the police department seeking other employment options. *I have nothing concrete yet, but I am looking for a plan B and plan C because it's – I don't think, regardless of how this turns out, I can survive at the PD."* (emphasis added).

> Furthermore, ¶ 83 says:

Plaintiff emailed Adams on August 5, 2020, and in this email he stated "***If*** the decision is made to retain Lee White as an employee and simply put him on a last chance agreement, I have no intention of requesting the decision be different. However, it will not be possible for me to, nor should it be reasonably expected that I, *continue to tough it out and work with him.'* *(Emphasis added).*

These merely prove that Plaintiff was willing to wait until the city administrator, mayor and city council made their decision on August 18, 2020, as to whether they were going to terminate White, or at least discipline him in a serious enough manner as to prevent the further harassment and retaliation of Plaintiff. However, they took no action whatsoever. They didn't fire White and they didn't discipline him. Consequently, Plaintiff went and met with Defendant's managers *the very next morning*, August 19, 2020, and informed them he couldn't take the

harassment and retaliation any longer, that he was physically ill, that he was having panic attacks, couldn't sleep, and simply couldn't take it anymore. That is when he told them he was going to have to gut it out until September so that he could retire, and that is when the City Attorney decided to place Plaintiff on administrative leave with pay because, as he stated, *"I don't want to send you back into a hostile environment and have to explain this to a jury later."* In fact, testimony from the city managers who Plaintiff spoke to about the retaliation and about needing to leave have testified otherwise. *PSOF ¶ 87-88.* Thus, the assertion that Plaintiff "did not intend to continue his employment if Defendant terminated or disciplined White, or took concrete steps, meaningful steps, to stop the retaliation, holds no weight.

Although not cited in Defendant's supporting brief, there is currently a case, *Fleming v. City of Boise*, I am an adult citizen of the United States, competent to testify as a witness and make this Declaration on personal knowledge. which this Court decided in November of 2024, and is currently on appeal to the Ninth Circuit Court of Appeals. Plaintiffs also assert that the facts in *Fleming* are distinguishable from those in this case, as the facts in *Fleming* did not include a reduction of the plaintiff's responsibilities, a significantly reduced performance evaluation, a change in working conditions, being placed on a PIP, constant false accusations of poor performance, being forced to retire and being placed on administrative leave. *Fleming v. City of Boise*, I am an adult citizen of the United States, competent to testify as a witness and make this Declaration on personal knowledge. In that case, this Court held that the incidents which had occurred were not enough to constitute a constructive discharge standing alone. *Id.* at *13. Those incidents included: 1) three comments about retirement related to leg surgery, 2) an incident where the plaintiff was kicked out of the office during a meeting with his boss, 3) an

accusation of "a racist act", and 4) three total comments made in two days about retirement after the plaintiff spoke to PERSI. *Id.* at *12.

Unlike in *Fleming*, Plaintiff has alleged many more serious instances of retaliatory conduct, including a reduction of the plaintiff's job responsibilities, a significantly reduced performance evaluation, a change in working conditions which included constantly being accused of poor performance based on trumped up allegations, efforts to get Plaintiff to early retire, being placed on a PIP based on false accusations of poor performance, and being placed on administrative leave. Furthermore, here, Plaintiff actually had job responsibilities and authority taken from him by being excluded from meetings he needed to be part of to conduct his job duties, and he also was shunned at the 2019 Christmas party, and received official, unwarranted criticism from White on his 2019 performance evaluation.

Because there are disputed material facts upon which a reasonably prudent jury could find that Plaintiff was constructively discharged, Defendant's motion for summary judgment on the §1983 procedural due process claim should be denied.

> **2. Plaintiffs can establish that Defendant city is responsible for Chief White's conduct, since a city official with final decision-making authority ratified Chief White's retaliatory conduct by refusing to punish or take any action against Chief White or to protect Plaintiff.**

Defendant asserts that, because it has not adopted an unconstitutional official policy that resulted in the violation of Plaintiff's procedural due process right, it can't be held liable. Specifically, Defendant asserts that Plaintiffs do not have proof to show that "there was a course of action consciously chosen from among various alternatives or evidence that policymakers… deliberately choosing [*sic*] a training program which has been proven inadequate." Defs. Memo in Supp. of Mot. for Summary Judgment, 13. However, this assertion is incorrect because former

Mayor Widmyer, and City Administrator Troy Tymesen, failed to punish or terminate Chief White for his retaliatory behavior, or protect Plaintiff from the retaliation, in accordance with the both the 2019 and 2020 personnel rules. They were each officially adopted by the city council. Thus, by failing to act, both former Mayor Widmyer and Tymesen each ratified Chief White's conduct, but also breached their own duty to stop retaliation in the workplace.

Moreover, the Ninth Circuit has held that plaintiffs can establish a *Monell* claim under a theory of liability that asserts a municipal official with final decision-making authority ratified the unconstitutional conduct of a subordinate that caused the constitutional deprivation. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010). Here, Plaintiffs have alleged that Mayor Widmyer and Tymesen ratified Chief White's retaliation by making a final decision not to punish or terminate Chief White. Indeed, Tymesen has testified that he had the sole authority to terminate or discipline department heads. Further, Mayor Widmyer could consider a department head's appeal of such an action by Tymesen. They had final decision making authority to discipline and terminate department heads. The facts on record prove that Mayor Widmyer and Tymesen ultimately decided to do nothing about Chief White's conduct, as Tymesen testified that Chief White was not disciplined in any way. *PSOF 83.* As such, the city, through former Mayor Widmyer and Tymesen as city officials with final decision-making authority, ratified Chief White's unconstitutional retaliatory conduct by refusing to do anything to stop the retaliation. Ultimately, municipal policy on how retaliatory conduct was to be handled, as enforced by the mayor and Tymesen, was the primary force behind Plaintiff's constructive discharge because the mayor and Tymesen, through their final decision-making authority as provided in the personnel rules, ratified Chief White's retaliatory conduct. Further they acted (or rather failed to act) as final policy makers.

Nowhere in the memorandum in support of the motion for summary judgment has Defendant asserted that Tymesen and former Mayor Widmyer did not ratify Chief White's retaliatory conduct by refusing to terminate or provide any disciplinary action in accordance with the personnel rules, and Defendant has not cited any evidence in support of this assertion either. Instead, Defendant points out that Plaintiffs have no evidence that "the City failed to adopt policies to prevent conduct which could create intolerable working conditions leading to an employee's constructive discharge" and that Plaintiffs have no evidence that the City failed to provide adequate training to supervisory employees. Defs. Memo in Supp. of Mot. for Summary Judgment, 13. However, this is not the theory of liability that Plaintiffs are asserting to establish the *Monell* claim. Rather, Plaintiffs are asserting that Mayor Widmyer and Tymesen, as city officials with final decision making authority, ratified Chief White's retaliatory actions and failed to stop the retaliation. Thus, Defendant's motion for summary judgment on Plaintiffs §1983 procedural due process claim should be denied as Plaintiffs have established the elements of a *Monell* claim.

**B. Plaintiffs have a valid state law whistleblower claim under the Idaho Protection of Public Employees Act, Idaho Code § 6-2101 *et seq*, because there is enough evidence that a jury could find constructive discharge occurred. Furthermore, Plaintiffs filed their Complaint exactly 180 days after the adverse action accrued and thus timely filed the IPPEA claim.**

Defendant contends that Plaintiffs did not file their complaint before the 180-day statute of limitations and asserts that Plaintiff communicated that he had an intent to retire before August 19, 2020. Plaintiffs do not dispute that their complaint was filed on February 15, 2021; however, the assertion that Plaintiff made the decision to retire before August 19, 2020, is just not true. Prior to the city council meeting on August 18, 2020, Plaintiff had only made it clear that *if nothing was done about Chief White, and if White was allowed to continue to retaliate against*

20

*him,* Plaintiff would have to leave as he could no longer deal with the retaliation. When Plaintiff testified that after the council meeting was "not the first time [he] brought [retirement] up," this was because he had told city managers and Kirt Naylor that he would not be able to stay at the department *if* Chief White wasn't going to be disciplined or terminated.

In fact, this is actually what happened, and as a result, Plaintiff went to meet with the city managers the very next day, August 19, 2020, and told them that because the council had taken no action after reviewing Naylor's two reports, and left Plaintiff completely unprotected, he had to take retirement in September 2020. Plaintiff was placed on paid administrative leave on August 19, and remained on paid leave until he retired in <u>October, 2020.</u>  Truly, his statute of limitations on the whistleblower claim did not begin to run until he retired in October 2020, but giving Defendant every favorable inference, if such is found to be warranted, Plaintiff absolutely did not definitively decide to retire until August 19, 2020. That is the earliest date he announced his unconditional retirement. However, Defendant's position is even weaker given that after that date, Defendant was actively involved in negotiations with Plaintiff to try to get him to settle his potential claims against them. *Decl. Brainard, ¶56.*

This Court has before made it clear that when multiple events contribute to the employer's adverse action, the date that all events culminated into the ultimate adverse action is the date the statute of limitations begins to run. In *Brown v. City of Caldwell*, this Court stated that "under Ninth Circuit precedent, which the Court finds instructive here, a court may consider a series of adverse actions cumulatively act as a single retaliatory event." 2012 U.S. Dist. LEXIS 35314, 2012 WL 892232, *1-2 (D. Idaho 2012) (citing *Coszalter v. City of Salem,* 320 F.3d 968, 975 (9th Cir. 2003)). Plaintiff's constructive discharge is the ultimate adverse action that culminated because of Chief White's series of retaliatory events and the city's series of actions in

failing to protect Plaintiff from retaliation. Plaintiffs have demonstrated enough evidence that Plaintiff made the decision to leave the police department on August 19th, 2020, although even this is muddied by Defendant's desire to negotiate a settlement with Plaintiff, and by their decision to keep him on paid leave until October, 2020. Thus, the official date of the constructive discharge—the adverse action Plaintiffs have alleged for the whistleblower claim—was August 19, 2020 or until he was off of paid administrative leave in October 2020.

Besides asserting that Plaintiffs did not timely file their complaint, Defendant has only argued in their supporting brief that Plaintiffs have not shown there are enough facts to establish a constructive discharge as a matter of law. However, as demonstrated above, there are enough material facts in dispute regarding constructive discharge, that as a matter of law, summary judgment is not appropriate to grant to Defendant on the IPPEA claim.

**C. Plaintiff's common-law state tort claims should only be dismissed if the Court denies Defendant's motion for summary judgment on the IPPEA claim.**

Defendant asserts that Plaintiffs' negligent infliction of emotional distress and loss of consortium claims should be dismissed on summary judgment because the Idaho Supreme Court has held that claims brought under the IPPEA supplants claims brought under the Idaho Tort Claims Act (ITCA). However, the decisions Defendant cited from the Idaho Supreme Court already had a procedural background where the causes of action either went to trial and had damages awarded or at least survived summary judgment. Since Plaintiffs' claims have not yet been through the summary judgment stage, the Court should first decide whether the IPPEA claim survives summary judgment, before deciding whether Plaintiffs' remaining state law claims survive.

*Eller v. Idaho State Police* had already gone to trial and had damages awarded by the time the Idaho Supreme Court issued the decision on review, so the question was whether the plaintiff's non-economic damages could be awarded under the negligent infliction of emotional distress claim or the IPPEA whistleblower claim. *Eller v. Idaho State Police*, 165 Idaho 147, 153-54, 443 P.3d 161, 167-68 (2019). The IPPEA claim in *Berrett v. Clark Cty. Sch. Dist. No. 161*, too, survived summary judgment. *Berrett v. Clark Cty. Sch. Dist. No. 161*, 165 Idaho 913, 926, 454 P.3d 555, 568 (2019). Plaintiffs concede that, when damages are awarded under an IPPEA claim, damages cannot also be awarded under ITCA claims for the same occurrences. However, should the IPPEA claim be dismissed on summary judgment, Plaintiffs remaining state law claims should survive, as Defendant has not contended that there are no genuine issues of material fact to the remaining state law claims which would bar Plaintiffs remaining state law claims as a matter of law.

Furthermore, to date, neither an Idaho court nor this Court has decided how ITCA claims should be handled at summary judgment when an IPPEA claim survives summary judgment. Therefore, Plaintiffs recognize this as an open question, and the Court has a decision to make should it find that Plaintiffs IPPEA claim survives. Since the purpose of precluding non-economic damages under ITCA when damages are awarded under IPPEA is to prevent a double recovery, it could be an option to allow Plaintiffs remaining state law claims to survive summary judgment even if the IPPEA claim also survives. Any double recoveries awarded at trial can then be reversed so that there is no double recovery, and Plaintiffs only recover either under the IPPEA claim or the remaining state law claims.

As such, Defendant's motion for summary judgment on the remaining state law claims should be denied *if* Plaintiffs' IPPEA claim does not survive. Should the IPPEA claim survive, the Court should decide whether Plaintiffs' remaining state law claims should go to trial.

DATED this 23rd day of July, 2025.

*/s/ Larry Beck*

Larry Beck

Attorney for Plaintiffs

## CERTIFICATE OF DELIVERY

I HEREBY CERTIFY that on the 23rd day of July 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Katharine B. Brereton

Lake City Law Group, PLLC

435 W. Hanley Ave, Ste 101

Coeur d'Alene, ID 83815

Tel: (208) 664-8115

kbrereton@lclattorneys.com

**BECK LAW OFFICES**

By:      */s/ Larry Beck*

Larry Beck

Attorney for Plaintiffs

Beck Law offices

8884 N. Gov't Way, Ste. D

Hayden, ID  83835

Tel:  208 772-4400

Fax:  208772-7243

larry@becklawidaho.com