**BECK LAW OFFICES**
Larry Beck
8884 North Government Way, Suite D
P.O. Box 1390
Hayden, ID 83835-1390
Telephone: (208) 772-4400
Facsimile: (208) 772-7243
larry@becklawidaho.com
Idaho State Bar No. 3751
*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LEE J. BRAINARD and CAROLYN P. BRAINARD, husband and wife, | Case No. 2:21-cv-00073-DKG |
| Plaintiffs, | **DECLARATION OF LEE J. BRAINARD** |
| vs. | |
| CITY OF COEUR D'ALENE, IDAHO, A municipal corporation and political subdivision of the State of Idaho, | |
| Defendant. | |

LEE J. BRAINARD, being first duly sworn by oath, deposes and states:

1.     My name is Lee J. Brainard, and I am a resident of Kootenai County, Idaho. I am one of the plaintiffs in the above-entitled matter. I am an adult citizen of the United States, competent to testify as a witness and make this Declaration on personal knowledge.

2.     I worked at the Coeur d'Alene Police Department for 24 years, having been hired on in 1996.

Declaration of Lee J. Brainard, 1

3.      Throughout my tenure, I was promoted through the ranks. I was promoted to Sergeant in 2005, Lieutenant in 2012, and Captain on December 1, 2017.

4.      I was a Captain until the end of my employment in September 2020.

5.      During my time as a Captain at the City of Coeur d'Alene, I was not the only person advising Chief White about improving working relationships with City administrators, the mayor, and personnel from other agencies. Captain Hagar would also advise Chief White of the same things during check-in meetings when White met with Hagar and I. White was generally receptive whenever Hagar or I brought this to his attention in 2018 and prior to October 2019. White remained receptive until I testified during the internal investigation conducted by the City Assistant Attorney, Randy Adams, on October 24, 2019, wherein I testified that Hagar had recorded certain city staff meetings (known as MOU meetings), and also that he had tried to to coach me on how to testify about how I could truthfully testify that there weren't any recordings of the meetings.

6.      Check-in meetings did not only occur on Mondays of each week. The meetings occurred when command staff was present, and we sometimes had different work schedules, so group meetings did occur on different days of the week as well. The chief had check-in meetings with me and Hagar almost every day when our schedules allowed. These meetings slowed down in early to mid-2020, and I was involved in fewer and fewer of these meeting until I went on administrative leave on August 19, 2020.

7.      My learning period as a new captain was not in a "winding down" phase after only serving as a captain for six months. Six months was nowhere near enough time to learn the role and all duties of a captain. This was further the case because both White and Hagar had recently come from long careers with the Mesa police department, and they had very different

ways of doing things than officers who had risen up the ranks in the CDA PD understood. I believed that it would certainly take a year or longer to learn the "Mesa Way" as White and Hagar had referred to their police management philosophy, and this would be true of any new captain at any police department. White had never communicated to me his belief that a new captain should totally understand all of the intricacies of the job in just six months.

8.      Chief White never came to me to discuss perceived performance issues in 2018 or any time before October 24, 2019. The alleged concerns started being brought up after November 2019, after I testified in the internal investigation, after Randy Adams had concluded that Captain Hagar had lied during his investigative interview with him, and after White and Hagar had been given letters of expectations by the city. In fact, the opposite was true. White provided me with constant and consistent positive feedback regarding my job performance. He even told me that he was only receiving very positive comments regarding my job performance from lieutenants, sergeants, and line staff. I initiated the majority of the "coaching" discussions with White when I sought feedback from White regarding the best way to perform a new task that I had not done before. White did not come to me to coach me or otherwise offer help in how I should conduct a certain task. Instead, I went to White for feedback on how to best proceed with handling new situations or tasks that I had not done before.

9.      White did not discuss with me the areas noted in my 2019 performance evaluation "on multiple occasions" throughout the year. White never discussed any of these things with me at any time before November 2019. Moreover, the December 2019 performance evaluation occurred about 60 days after I blew the whistle on Hagar for having lied to Randy Adams during his interview about recording meetings, and on how Hagar had tried to get me to lie for him during my interview with Adams. Immediately after I was interviewed by Adams, I told both

Hagar and White what I had told Adams in my interview with him. After telling White and Hagar about how I testified to Adams, I immediately noted that both White and Hagar seemed very displeased with me for having told Adams the truth about the meetings being recorded by Hagar.

10.    Prior to me having testified in the October 2019 investigation about Hagar's dishonesty, and prior to me telling White and Hagar how I testified, and prior to Hagar and White receiving their letters of expectations, I received very positive performance evaluations over my career. In fact, both of my 2018 evaluations had White as my sole evaluator, and both times White gave overall ratings of "Outstanding," which was the highest performance ranking obtainable. Further, they contained very glowing remarks. Some of the remark for the June 2018 evaluation included: "He has repeatedly demonstrated why his skills and leadership were a perfect fit for this position; he is a capable and effective leader; his reduction of the number of crimes has been remarkable; he is a tremendous asset to the department and the city, he hired and filled our ranks to capacity for the first time in 10 years, through his hard work and dedication; Captain Brainard had an outstanding six months and I look forward to working with him for years to come."

11.    Some of White's comments on my December 2018 evaluation included: that he was promoted to captain one year ago, and since his promotion he "has done a great job of legitimizing his promotion internally and externally; the patrol division continues to function at an extremely high level; and he had a great year and his overall rating is outstanding." Up to at least October 2019, my job performance was rated as either outstanding (by White), or above satisfactory by White or past supervisors.

12.    Following my blowing the whistle on Hagar, and after White and Hagar received their letters of expectations, White became angry with me. Then, about 30 days later, White gave

me the December 2019 performance evaluation. I received an unexplainable and sharp downgrade in my performance rating compared to what I had received throughout my career, and my last two evaluations by White.

13.     White did assign me the 'frequent customers' projects, but I followed up with him regarding these projects. This is another example of White looking through old emails to look for minor issues that he could use against me, once White learned that I had told the truth during the investigation and after White and Hagar received letters of expectations. In this particular instance, White only told me that I needed to solve the problem of repeat offenders continuing to offend or use resources of the department. He did not tell me anything more concrete than that. It was White's expectation that I would delegate the issue to lower-level staff. I did delegate tasks to lieutenants and sergeants, as well as tactical teams, and I met with many outside professionals in an effort to minimize the impact of these frequent violators or customers of the PD's services. However, many of the problems with frequent callers were related to serious mental health issues or addiction, or both, and they were never going to be completely solved. I did involve mental health providers to assist when needed, and had my front line officers and lieutenants recommend a host of community resources to the "frequent customers."

14.     I was assigned an 'auto burglary' analysis project by White. I worked on this project on a regular basis. I communicated the project's status in briefings, and I delegated much of the work to be done to subordinate officers. I had cluster maps prepared which showed where many of the burglaries occurred, and I stationed patrols, and extra patrols, nearby. I arranged for surveillance to be performed in these areas. I utilized unmarked cars, foot patrols, and had officers watching these areas from rooftops with binoculars. I periodically briefed White on all of these things. When I did, White acted as though he wasn't very interested in our progress. This is

another example of White using unfounded criticism of my job performance to force me to quit, or early retire, or was an effort to find performance deficiencies to use to fire me or demote me.

15.     White did not have multiple discussions with me regarding a perceived failure to address the 'daily briefing' report issues. I did not have a major role in completing the Daily Briefing Reports, as they were typically left to sergeants to prepare.  My role, as a captain, was simply to delegate the briefing to these lower ranks and ensure that they were being completed properly. White and I had between one and two discussions about this. Both of these conversations related to one sergeant's difficulties with using correct grammar and spelling when writing the daily briefing. I assigned two lieutenants to help mentor the sergeant on her grammar and spelling issues. They did assist her and she improved significantly in writing the daily briefing. There were no more issues or discussions from White on this until he later became upset that the sergeant received a performance evaluation that he thought had contained too high of a rating. This is yet another example of White using unfounded criticism of my job performance to force me to quit, or early retire, or was an effort to find performance deficiencies to use to fire me or demote me.

16.     I did not fail to ensure that a 'police pursuit packet' had been timely completed. I communicated to White on the progress of getting the pursuit package completed. I advised White that the incident involved a complicated pursuit and the lieutenant was working on it as fast as he could, and he was keeping me informed. The packet was completed a few days after White had inquired about it, and White did not discuss this with me again. This is another example of White using unfounded criticism of my job performance to force me to quit, or early retire, or was an effort to find performance deficiencies to use to fire me or demote me.

17.    I did not agree with White's critiques in areas he claimed I had deficient performance, other than overtime reduction and needing to improve court scheduling issues. These were both improved upon. Regarding the other issues, White explained to me on several occasions (before my October 2019 testimony and before White and Hagar had been given letters of expectations), how happy and pleased he was with the progress I was making in managing the patrol division's issues. These types of comments were similar to the comments White had made about my performance in the two 2018 performance evaluations. For example, White told me he was thrilled with how I was using computer statistics and sending personnel to classes so they could better plan on where to deploy patrols to get the highest use out of their resources. White was very happy about me having personnel attend classes on how to do crime prevention through environmental design, so that they could help educate businesses on environmental steps they could take to help reduce crime to their businesses.

18.    Despite what White has said, we did have a comprehensive plan developed for managing active shooter scenarios. I worked with a lot of personnel within the PD, and with some in outside agencies, to plan as much as possible for active shooter events. I involved schools, fire department, and EMS personnel in planning for a potential active shooting event. I conducted two live trainings on mock active shooter events, and I arranged for my patrol officers to participate in constant active shooter practice runs. The PD did have an active shooter plan, and I received positive and enthusiastic feedback from lieutenants, sergeants and line personnel, regarding the active shooter training and comprehensive plan. This is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

19.     Despite what White has said, I reviewed and dealt with 'overtime issues' on a monthly basis. White did ask me for occasional status updates, and he and I would have conversations about what I was doing on this issue. On the specific Daylight Savings Time issue cited by White, only four individuals on shift out of the whole department received overtime pay that day, and only for one hour each. This was the exact same way the entire city government handled overtime on Daylight Savings Time for years. Further, I had only been a captain for one year at this time, so it defies logic when White says I did this for four years in a row. This criticism is completely unjustified and is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

20.     I was never made aware of 'other instances' of misconduct or poor performance issues during the (December 2019) evaluation period. White explained to me on several occasions (before White learned that I had refused to lie for Hagar during my October 2019 investigative interview, and before White and Hagar had been given letters of expectations from the city, just how pleased he was with the progress I was making in managing the patrol division's issues. These types of comments White had made to me were very similar to the comments White had made about my performance in the two 2018 performance evaluations.

21.     Despite what White has said, I followed up on the 'noise complaints' on a regular basis with both White and the mayor. I regularly texted the mayor on this issue. I also utilized reader boards warning against excessively loud vehicle noise, and I assigned foot patrols to watch for persons revving up their vehicle engines. I was praised for being the first captain to deploy reader boards for this situation. I had officers stand by with decimal meters. White fabricated my mishandling of noise complaints, just as he did with so many other criticisms he raised against me after November 2019. I communicated with White, Hagar, the mayor, and my

Declaration of Lee J. Brainard, 8

lieutenants and sergeants regularly about all of the things I was doing to help solve the noise complaints. This is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

22.     A citizen complained about massage parlors operating in town. I reached out to the citizen, and I also had my sergeants and lieutenants reach out to the citizen as well. We explained to the citizen there wasn't much the department could do about the issue because there wasn't a city ordinance making the issue illegal. I communicated this message along to White and the mayor. White told me that it was my job to research the ordinances, and I told White that the city legal department told me it is not the job of the police department to do research on ordinances. Nonetheless, to try and make White happy, I still did the research and communicated this to White and the clerk.

23.     Regarding White's criticism of me for conducting a promotional exam for a sergeant's position, I had been part of several different promotional testing processes before. I followed past CDA PD testing protocols that had always been used before. I followed all past practices. I had only been a captain for one and half years, and I did not know that White wanted to use the "Mesa Way" to conduct the sergeant testing process. However, because I suspected White would not want to follow the standard CDA PD way of doing the testing process, I prepared a draft of the process and questions and gave that to White to look over and make suggestions on. White then told me what he wanted changed, and I made the changes. I then showed him the changes, and he told me they looked good. White never raised the issue again until after I had testified in October 2019 and after White received his letter of expectations from the city. This is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

24.    White's email regarding the July 4, 2019, officer involved shooting, was sent just four days after the officer involved shooting took place. I was unable to reach the psychologist the police agencies used in such events over the long holiday weekend. White wanted the officer involved back to work that next Monday. I had discussed this with my lieutenants and they agreed the officer involved needed more time off than just a few days. White told me that the 'Mesa Way' was to get such officers back on duty in just a couple of days after their involvement in a shooting. However, after I explained to White that the lieutenants and I knew this officer was hurting, and we all felt this officer needed a little more time to be off duty and meet with a counselor, White said he agreed that this would be reasonable. White did not discuss this with me again. So, to dredge this unfounded criticism up now, is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

25.    I was never put in charge of 'construction zone signage.' Rarely, if ever, is there street or road construction scheduled for November. Due to a variety of factors, road construction occurs in the summer months. Furthermore, that is a task that a Patrol Captain would never be tasked with. White was simply annoyed by how Tim Martin with the City Street Department would deploy his construction zone signs, and White stated that he thought Tim Martin was incompetent in his duties because he didn't do things the way White wanted them done. White had asked me to drive by a construction route in mid-town because he felt Tim Martin had failed to adequately deploy signage to direct traffic in a clear and understandable manner. I drove the route and determined the signs were deployed appropriately. My response to White's email was that after talking the matter over with Tim Martin, he was now willing to allow the police department to review his sign deployment plans in order for us to provide input in the future.

Declaration of Lee J. Brainard, 10

White never followed up with me on that issue, other than occasionally mentioning that the street department didn't know what they were doing. So, to bring this up as a basis to place me on a performance improvement plan is wholly disingenuous, and is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or to use to eventually demote or fire me.

26.     The first email I received from White to assist the mayor with a video of the department's "teams in action," was on October 1, 2019, not September 16, 2019. The email dated September 16, 2019 was from the Mayor to Fire Chief Kenny Gabriel and Lee White. By October 3, 2019, two days after I received an email on this issue, I had contacted Jeff Crowe at the media company and arranged for him to complete the requested work. This task was completed by me within two days after receiving White's email. White is simply wrong about whom he sent emails to, and when, and is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or use to eventually demote or fire me.

27.     Despite what White has said about me being late with completing performance evaluations, all of the performance evaluations I was tasked with were completed on time. The initiation of the evaluations process had not been delayed, nor was constant progress delayed. White's email was the normal course of follow up on tasks, when he actually remembered to send one. The then-existing historical process was that the Chief's Administrative Assistant, Katherine Brumley, would track the evaluation due dates and send out a list to supervisors when the evaluations were coming due. This email would be the first conversation that refers to the new process whereby the supervisors were tracking the evaluation due dates themselves rather than Ms. Brumley. This email did not suggest that I had failed to be timely. This is yet another exaggeration or pure fabrication by White.

28.     After 2020, White continued to retaliate against me for having told the truth in the October 2019 investigation, and for his receiving a letter of expectations from the city, up until the day I stopped going to work at the department on August 19, 2020. As the city's own investigator, Kirt Naylor stated in his investigative report, *"From the evidence of what occurred since December 2019, it seems there is a pattern of finding, if not looking for performance deficiencies in Brainard by White. ... Despite White's denial that he was looking for performance issues with Brainard, these minor incidents seem to show otherwise."* Naylor's observations and findings here are exactly what I was experiencing from White on a regular basis after December 2019 until I had to involuntarily retire from the department.

29.     I had sent the information regarding the 'mitigation meeting' issue in an email and was informed, for the first time, of the correct process. This was my first experience coordinating a mitigation meeting. Additionally, the comments I made to the employee who was the subject of the mitigation meeting, was something to the effect of "you are a valuable employee, this one incident does not define you, we recognize the value you bring to the Department, and we all occasionally make mistakes". I encouraged the employee to continue to work hard, and to not be discouraged. I was simply encouraging the employee and leading him appropriately. This is another example of White fabricating reasons to correct me.

30.     Overtime was a constant conversation among managers and supervisors at the department, and all of the supervisors in Patrol, including me, were consistently implementing ways to reduce overtime. The issue with court overtime is that it can't be avoided. The attendance at court is a daytime function. When our personnel who don't work during daytime hours are summoned to court during daytime hours, and are not on duty, overtime will be incurred. This is unavoidable. Nonetheless, all patrol supervisors were tasked by me, and the patrol captains

before I was promoted, to communicate with the prosecutors' offices to ensure court cancellations were communicated timely so that we could try to help avoid a late shift officer showing up for court on his/her off hours, only to find that court had been cancelled. We were diligent in these efforts. But again, Court time OT can't be avoided due to Court cancellations at the last moment, and White was well aware of this fact, so this is yet another example of White looking for reasons to criticize my performance to get me quit, or early retire, or use to eventually demote or fire me.

31.     The complaints by White regarding my tearing up training requests and kicking an IA binder, were completely fabricated. The occurrences White mentions had occurred months before, and even more than a year in the past. They were simply jokes being played on each other by longstanding co-employees and friends. No one took these jokes seriously or were offended. In fact, practical jokes were expected from time to time and were reciprocated on. I never took offense when a practical joke was played on me, and my department buddies laughed when jokes were played on them. Even worse, White had even more so encouraged practical jokes at the department when he became chief, and brought with him the Mesa PD saying of "Funny Trumps Wrong!"  White and Hagar encouraged practical jokes at the department and actively engaged in them. However, this time period was when White went and actively solicited any information he could get from other department personnel to use against me to begin building a file of so-called deficiencies to either fire me, demote me, or pressure me to quit or early retire.

32.     Despite what White has said, Atlas Road in Coeur d'Alene, has historically been noted as a high traffic enforcement area due to the narrow roadway, the high traffic speeds, and the volume of complaints. This area is known and studied by the City, and the Idaho Department

of Transportation. It has been an area of focus and attention by the police department for years. Additionally, a male, who lived on Masters Drive between Atlas and Fairway, had repeatedly called the Police department and the City of Coeur d'Alene, demanding that we have enforcement in the area.

33.     Despite what White has said, It was common practice to add last minute small purchase items to the budget before it was finalized. This practice happens every year and by virtually every department. Avriett's submission for a new helmet for one of the department's motorcycle officers was justified. Although we try to be as thorough as possible in our early and later rounds of budget preparations, last-minute items need to be budgeted for or there won't be money to pay for them. This was not a matter that required correction. It is another example of White targeting me after I blew the whistle on Hagar, and both he and White received letters of expectations.

34.     Despite what White has said, it has never been the standard that a captain had to communicate with the chief before informing an employee of the results of a selection process. This was the first communication by White to do so, and is another example of White's harassment and retaliation in creating reasons to correct me. Although this email was addressed to both me and Hagar, it was directed at me, and is being falsely used by White as an example of a job deficiency. It had never been the standard that a captain had to inform the chief prior to entry level officers completing their field training program. Once again, this is another example of White looking for reasons to criticize my performance to get me quit, or early retire, or use to eventually demote or fire me.

35.     Despite what White has said, I never posted anything about the particular child that had been lost and was later found, that White criticized me for having posted about. I

granted approval for the on-duty supervisor to submit the post due to a request from the mayor, who had been receiving a flood of calls from members of the public requesting updates. The family of the child did not request that we refrain from posting updates. This is wholly fabricated by White, and another example of White looking for reasons to criticize my performance to get me quit, or early retire, or use to eventually demote or fire me. and another example of White retaliating against me and trying to get me to take early retirement.

36.     The planning of the table-top training exercise, while still being planned, was necessarily delayed by the department's response to the Covid pandemic, and White's direction to minimize face to face contact or interaction. Nonetheless, I was still communicating with the other individuals involved in the project, and as time allowed, we progressed with the planning. The training was a table-top exercise designed to HSEEP Standards. HSEEP stands for Homeland Security Exercise and Evaluation Program, which is the federal standard for disaster response training. The training was attended by almost every supervisor at the Police Department, and was well-conducted and well-received. This is another complete fabrication by White.

37.     The June 2, 2020 incident is an example of a bold and blatant effort on the part of White and Hagar to set me up for disciplinary action. White corrected me for failing to inform him in a timely manner of an incident that he had already been fully informed of. I had been advised that White had been fully briefed on an officer related allegation of sexual misconduct with a jail inmate, and that the complaint had been almost immediately proven to be completely false. White was not at the PD until early to mid-afternoon on that day, June 2, 2020. This was also an extremely busy day for us due to armed protests in downtown Coeur d'Alene. I was also in budget meetings a large part of the day. White asked me a couple of times during the day

whether there was anything going on in patrol, and having already been told that White had been fully informed of the bogus complaint, I did not think to initiate a conversation with him about the bogus allegation at that time. When I did initiate a follow-up conversation with White later that day, with Lieutenants McCormick and Schmitz, White responded in an overly dramatic and aggressive manner, kicked both lieutenants out of his office, and began demanding to know why he was just finding out about this incident. This is another example of White lying, as he didn't just find out about the incident because Captain Hagar told White all about it earlier in the day, including that the complaint was bogus and quickly determined to be a false complaint. His plan clearly was to use this incident to demote me, fire me, or force me to quit or early retire. Investigator Kirt Naylor's report on this incident is included in Plaintiffs' Statement Of Disputed Facts, and Naylor recognized this was a false criticism of me by White.

38.     The allegation of poor performance by me from White regarding the June 4, 2020 incident response team event, is also completely fabricated. I completed the tasks as assigned to the incident response team, which I was in charge of. The reason I was not at the command post that morning was because I was meeting with Melissa Tosi, Troy Tymesen, and Randy Adams to discuss the fabricated performance improvement plan (PIP) White had put me on the day before. I had been at the PD in the incident command center earlier in the day, made sure that everyone understood the plan and their roles, and then I had left for my meeting with the above mentioned city managers. All went well with the incident and according to plan. The irony here is that White read to me from a PIP document the day before, in front of Melissa Tosi, after both Tymesen and Tosi told him not to use the PIP form as it was unjustified, and I was shocked at receiving this PIP from White as everything he included on it, much of what has been covered above herein, was fabricated and clearly designed to get me to quit, or early retire, or be used to

eventually demote or fire me. As a result of being very upset and physically ill from all of the retaliation from White, I asked to meet with Tymesen and Tosi on June 4, and they felt it was a good idea, too. I told them that I had been physically ill, was having panic attacks, and had not been sleeping well for quite some time because of White's retaliation. They kept telling me they would be able to stop the retaliation and to just hang in there.

39.     I disagree with White's statement that I wasn't timely following through with enforcement issues at the Third and Roosevelt location in Coeur d'Alene. I had coordinated with the CAT team, various special enforcement teams, Code Enforcement, the city legal department, the city building department, and neighbors of the subject property. I had full knowledge of the enforcement efforts that had been completed on this matter, and I regularly and consistently communicated updates on the progress that had been made to White, the mayor, and many others involved in the matter.  The homicide that occurred there was one of the last issues we dealt with at that location, but there had been other drug dealing and code violations at that location before the homicide occurred. Although I had been diligent with working to resolve the issue of the homicide at that location, the more common issues we had been focused on for a period of time were more related to drug dealing and code violations at that property. I made good progress on these issues and reported to White and the mayor periodically as required. Again, this is a complete fabrication by White.

40.     Despite what White has said, the performance evaluations I was tasked with completing were completed and submitted on time. They were not late, as White alleges. White had no reason to intervene as the evaluations were completed timely and the officers were going to timely receive their pay raises. This is just another example of White lying to target me and justify his retaliation and harassment.

41.     After I individually told White and Hagar what I had told Randy Adams in my October 2019 interview, about the MOU meetings and that Hagar had recorded some of the meetings, both of them responded by looking very frustrated or disappointed towards me, and also by saying something similar to "okaaaaaay," in a long drawn out manner that immediately conveyed to me that they were upset and disappointed with the way I had answered Adams's questions.

42.     After receiving the investigative reports completed by Randy Adams, and after receiving their letters of expectations from the city, both White and Hagar let it be known right away at the department that they were angry with the city's decisions, and that they felt the entire investigations by the city had been biased against them. They discussed how to present a rebuttal or appeal, but excluded me from any further discussions on these matters. Thirty days later, White gave me my December 2019 performance evaluation that has been discussed in detail above.

43.     White continued to retaliate against me by giving me reduced ratings in my December 2019 performance evaluation, constantly nit-picking my job performance throughout 2020, placing me on a PIP on June 3, 2020, setting me up at work to fail throughout 2020, taking away important job duties, trying to get me to take early retirement, and by completely fabricating alleged performance deficiencies again and again. This all led me to having to be placed on administrative leave with pay until I could involuntarily retire 6 years earlier than I had planned for. While n paid administrative leave, which I did not ask for, I was unable to learn and grow in my career as a captain in a mid-sized police department.

44.     In addition to Chief White giving me a poor performance evaluation in December 2019 and putting me on a performance improvement plan in June 2020, White also took several

job duties away from me by excluding me from meetings, directing me not to communicate with elected officials and city administration staff, punishing me for carrying out certain job duties and then giving me corrective directions, and retaliating against me for upholding the Law Enforcement Code of Ethics by refusing to lie for Hagar. By excluding me from meeting with other command staff in the patrol department, White effectively took away the following job duties:

Analyzing operating effectiveness and recommending improvements; recommend improvements in departmental operation and in the rules, regulations, and policies governing the department; gather, assemble, analyze, evaluate, and use facts and evidence; manage and direct a division of the PD and work closely with the police officers association; hold supervisors meetings to discuss within the chain of command recent incidents, trends, personnel issues, resource needs, and/or specific cases to promote a clear understanding of the issues within all ranks of the Police Division. I was precluded from acting as a department spokesperson when White falsely accused me for the social media post of the runaway child because he told me I needed to consult with others before posting any future submissions. I could not analyze situations and adopt effective courses of action because White disciplined me in the performance improvement plan for the event which he yelled at me for during the emergency workers appreciation parade. When White directed me not to communicate with elected officials or city administration, I was precluded from developing positive relationships with the public, private services, schools, government and other law enforcement agencies. White also yelled at me during a meeting in which I was advising him regarding activities and needs of the department, and he told me that if he wanted to go to City Hall and "punch someone in the mouth, quite frankly it's none of your damn business." This kept me from fulfilling my role as an advisor to

the chief regarding activities and needs of the department. In other words, White was no longer interested in listening to me and considering advice I would give him for helping the department run smoother and interact better with other departments and agencies.

45.    Regarding the Christmas party in December 2019, my wife and I arrived at the City employees Christmas party very close to the same time as White and his spouse did. All four of us walked in together. White didn't say anything to either me or my wife, but my wife and White's wife, Christy, made some small talk as they walked in. When it was time to sit down, we all went to the law enforcement table where some lieutenants, sergeants and their spouses were sitting. White and his wife then sat down. The others said nothing to the us, and no one offered to make room for us at the law enforcement table. In past years, we always sat with White and Hagar, and some of the lieutenants and sergeants at one table. We had to go sit at a nearby table by ourselves. No one tried to make room at the law enforcement table for us, and none of the officers made an effort to speak with us or come over to our table to sit with us or chat with us. It was very awkward for my wife and me to have to sit by ourselves at a large table, and other city employees and their spouses definitely took notice of this. After a while, HR Director Melissa Tosi came over from her admin table and asked us to come over to their table to have dinner with them. The admin table was already full, but they made room for us to join them. We felt felt awkward and embarrassed by being shunned from the law enforcement table where department supervisors and executives were seated, and it was clear to me that I was being shunned by department supervisors and executives.

46.    The city had an early retirement program for employees whom the city determined it was financially beneficial for the city to offer early retirement to. In January 2020, a few weeks after Plaintiff's significantly reduced performance rating, and about 60 days after

White and Hagar received their letters of expectations from the city, White and Hagar were compiling a list of department employees who might fit the city's criteria. I was included on the list, but I did not come close to meeting the city's criteria. I was sitting with White and Hagar when they were getting ready to submit their list to the city, and White turned to me and said I should seriously consider taking early retirement. I told him I wasn't considering it, and I planned to work for at least another 6 years.

Sometime around March 2020, White again approached me and asked if I would consider early retirement. I told White, again, that I wasn't interested in retiring until after working several more years. Shortly thereafter, I was approached by Lt. Johann Schmitz, who asked me if I would consider early retirement. Schmitz was a subordinate employee of mine, and someone who was close to White. It was highly unusual for a subordinate employee to approach their boss and ask him to consider taking early retirement. Schmitz even offered that he could hook me up with some private contract work if I decided to early retire. I believed without a doubt that Schmitz was doing White's bidding on trying to get me to early retire.

Later, during the June 3, 2020 PIP meeting with White, HR Director Melissa Tosi, and me, White made a comment after reviewing numerous trumped up allegations of performance deficiencies against me, that he wasn't doing this to get me to retire early. Later, I learned from Melissa Tosi that White had been pushing her and Tymesen for me to receive early retirement even though the numbers did not look good for the city. This, along with all of the false allegations White had raised against me, made it clear to me that the retaliation wasn't going to stop and I was likely going to be forced to retire or be fired or demoted.

47.    Plaintiffs agree with this statement of fact. However, please see the above paragraph for more detail as to what had occurred regarding the retirement issue.

48.    During the June 3, 2020 meeting with White and Tosi, White had read directly from a performance improvement plan document. It read and sounded like discipline, and that he was giving me essentially a last chance to improve or be fired. I can unequivocally state that all of the allegations of performance deficiencies that White read to me were completely untrue and fabricated, most of which I have already discussed above in this declaration. I told White that I did not agree with the allegations. I explained why they weren't fair or reasonable. He was angry that I spoke up for myself. The untrue and mostly fabricated allegations made it clear to me that the retaliation wasn't going to stop and I was likely going to be forced to retire or be fired or demoted. White later gave me a document that was entitled Expectations and it had changed from what he read to me from in the meeting. It was clear to me that White had wanted to place me on a PIP, but later he was told by Tymesen or Tosi that he couldn't because it had only been six month after he had given me an overall above average performance evaluation. However, the Expectations letter still contained most of the untrue and baseless allegations he discussed with me in the meeting.

49.    In the spring of 2020, and long before the June 3, 2020 PIP meeting, I had spoken to Renatta McLeod, city clerk, about the retaliation I was suffering from by White. She suggested I speak with Melissa Tosi. Shortley thereafter, I spoke with Melissa Tosi and I met with the mayor in his office. I eventually discussed my concerns about retaliation from White with Troy Tymesen and randy Adams. There were several meetings with them, individually and together, (except I spoke with the mayor only twice , and then later he was present for a group meeting), where I let them know that White was retaliating against me for having told the truth in the investigation conducted by Randy Adams. I told them about my significantly downgraded December 2019 performance evaluation, that I had been shunned and isolated, the Christmas

party events, my being excluded from meetings with my own subordinate supervisors, Hagar and White no longer meeting with me, White's constant and unfounded criticism of my performance, that White came into my office and looked at a picture of my perfectly healthy grandson and said "Hey, who's the downs syndrome kid?," and the taking away of significant job duties from my position.

I had several meetings with all of these city managers. The mayor told me that White "is a tyrant, and we need to find a reason to terminate him. We need to find a silver bullet to terminate him." During all of these meetings, every one of them, including the mayor, told me that White was a bully and extremely arrogant. They all told me he doesn't get along with other department heads and outside agency personnel. They told me he was hurting the city's image. They all told me that they wanted to fire White, that he needed to be fired, and the mayor just needed evidence of White's attitude towards others to convince the city council that White should be fired. They all told me to hang in there because they were going to fire White.

50.     Following the June 3, 2020 PIP meeting with White and Tosi, I had reached the point of feeling seriously ill from the retaliation White was inflicting on me. I was not sleeping well, I had panic attacks, and I had headaches, stomach problems, and I dreaded going to work under White. My wife was stressed too. Both my wife and I went to see medical doctors to get some advice. We both have been seeing trauma counselors since I was forced to retire from the department in 2020, and we are still seeing counselors for the trauma White has put me through and how it has affected my marriage and family life.

51.     I did believe the city managers when they told me that they were definitely going to fire White. Even though it was extremely difficult, I hung in there until August 19, 2020 because I believed them. The mayor had even told me that all I need is a "silver bullet" to

Declaration of Lee J. Brainard, 23

convince the council to support our decision to fire White. He explained that silver bullet would come from the two investigations the city had hired Kirt Naylor to conduct. One of those was on my complaints that White was harassing me and retaliating against me for telling the truth in an investigation, and the other was to try to verify how White was perceived by other department heads and outside agency personnel. They all felt that what everyone had seen about White's extreme arrogance and bullying attitude was proven out in the investigations, and if the investigation involving my complaints of retaliation turned out to be valid, then the city managers would be able to terminate White. They all constantly encouraged me to hang in there because they felt having the investigations completed would supply the evidence needed to terminate White.

52.     Outside investigator and lawyer, Kirt Naylor, conducted the investigations. He found that evidence existed to show that White had retaliated against me for having participated in an investigation. He also found in the concurrent investigation, that White was essentially not respected or liked by department heads and personnel from outside local agencies. Most of those comments were to the affect that White was a bully, was extremely arrogant, things had to be done his way, that he was smarter than anyone else, that he was not a team player, that he lied, and that he would get rid of anyone who crossed him.

53.     Following the completion of the Naylor investigation, I continued to be told by all city managers that I needed to just hang in there, trust in the process, and that White was definitely going to be fired.

54.     That the Naylor reports were discussed by the city council on August 18, 2020. I was informed that the council and managers had decided to take no action against White at all

following the Naylor investigations. He not only wasn't going to be fired, but he wasn't going to receive any type of discipline

55.    The following day, August 19, 2020, I went and met with Tosi, Tymesen, Adams, and City Attorney Mike Gridley. I told them that I had trusted them when they told me to keep hanging in there because White was going to be terminated. I told them I was very upset and they now left me no choice but to early retire. I was emotional and told them that I was dreading having to go back and take even more retaliation from White. I told them their decisions would only embolden White and he would be even more difficult to work with. I again told them I had been ill from all of this retaliation and stress, and so had my wife and family.

Mike Gridley told me he did not want me to go back to the department because it would continue to be a hostile environment for me and he didn't want to have to explain to a jury later why he allowed that to continue. He told me I would be placed on paid administrative leave until I could early retire in September or October. He also told me to try to work out a financial settlement with the city, and that I should get a lawyer. It was not my idea to be placed on paid administrative leave as I thought it would make me look weak and stigmatize me to officers at the department and other local public employees and officials that I really cared about. I felt the city was only doing this because they were worried about a future lawsuit. I felt they were doing this out of their own self-interest. Instead, I wanted the city to protect me from the retaliation by either firing or disciplining White, so I could continue to obtain command level experience by leading the Patrol Division. Placing me on administrative leave took all of that away from me.

Prior to this meeting, I never told the city managers that I wanted to retire or planned to retire. I was interested in obtaining my master's degree and eventually becoming a police chief at some police department, I planned to work at least another 6 years at the department and then

maybe take a police chief's position at some department if one became available. I had only discussed prior to August 19th that if the city did nothing, and White was allowed to continue to retaliate against me, I would probably have to retire early. However, all of the discussions up until August 19th was that I should hang in there and White would be terminated following the Naylor investigations.

56.    Following the initial discussion with the managers on August 19th with Gridley still present, I then went into an office with Tymesen and Adams and they explained to me how to make a settlement proposal. They explained what I should include in the proposal, like lost wages, lost benefits, emotional distress, etc. Later, I presented a settlement proposal to the Tymesen. He asked me to rework it and come up with another proposal for settlement. I did that. He then reviewed my second proposal, and asked me if I would accept a certain figure, and when I told him I couldn't, I didn't hear back for quite some time even though I periodically called and left messages or sent emails.

Then, after all of this, out of the blue, he sent me a letter that was obviously written by the city's lawyers that essentially said, 'hey, why don't you just reconsider retiring because we will send a letter to the chief and tell him he better not retaliate against you anymore.' I found this to be ridiculous and insincere on their part because White had completely ignored their letter of expectations they sent him in November 2019, and continued to bully, intimidate and harass city personnel and outside agency personnel like he always did. I knew that after all that had happened, if the city wasn't going to fire, or even discipline White in any way, White would continue to do whatever he wanted. A letter from the city telling White to 'play nice' at this late juncture would only give White a reason to laugh and gloat, and continue to do whatever he

wanted to do - including continuing to retaliate against me. It was clear to me that the city was making a last ditch effort to try to protect themselves if I later filed a lawsuit.

57.    I was a for cause employee while working for the city, meaning that I could only be disciplined or terminated for good cause. I never gave the city good cause to terminate my employment. In fact, I was an exemplary employee based on my past 10 years of performance evaluations. I always gave one hundred percent to my job and I loved serving the wonderful community of Coeur d'Alene. However, I simply could not be expected to endure the constant harassment and retaliation from White any longer, as the working conditions had become intolerable and no reasonable person in my position should have been expected to continue to work under those conditions. I also knew that the retaliation was having a negative effect on my physical and mental health, and that of my wife and family. My wife and I agonized over making the decision to involuntarily retire, but we ultimately realized the retaliation would not stop and the city wasn't going to protect me or even discipline White, so we decided that I had no choice but to involuntarily retire. Never, at any point did the City offer me a hearing to contest my constructive discharge. In fact, I learned through depositions that Tymesen considered me to have voluntarily retired, despite all of the meetings I had with him where he told me he understood that White was retaliating against me and to just hang in there because the city was going to fire White. Tymesen had even asked me if I would consider being an interim or permanent chief of police once they fired White. For him to now claim in litigation that I just decided to voluntarily retire six years earlier than I had planned to, is shameful and disingenuous.

I declare under penalty of perjury that the foregoing is true and correct as I verily believe.

DATED this 23rd day of July, 2025.

*/s/ Lee J. Brainard*

Lee J. Brainard
Plaintiff