UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LEE J. BRAINARD and CAROLYN P. BRAINARD, husband and wife,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF COEUR D' ALENE, IDAHO a municipal corporation and political subdivision of the State of Idaho,<br><br>        Defendant. | Case No. 2:21-cv-00073-DKG<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

This case involves a dispute over the end of Plaintiff Lee Brainard's career as a police captain with the Defendant City of Coeur d'Alene. Brainard complained to the City that the chief of police harassed and retaliated against him for testifying in an internal investigation. The City investigated Brainard's claims and ultimately decided not to terminate or reprimand the chief of police. The City then placed Brainard on paid administrative leave until he ultimately took early retirement. As a result, Plaintiffs, Lee and Carolyn Brainard (the Brainards), filed this lawsuit.

Presently before the Court is the City's Motion for Summary Judgment. (Dkt. 69). The motion is fully briefed and ripe for the Court's consideration.[1] A hearing on the motion was conducted on December 17, 2025. Having carefully considered the record, the parties' briefing and supporting materials, and argument, the Court finds as follows.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

In 1996, Brainard became a police officer for the City of Coeur d'Alene Police Department. (Dkt. 69-2 at ¶ 1; Dkt. 75 ¶ 1)[3]. Brainard was promoted to the position of Sergeant in 2005; to the position of Lieutenant in 2012; and to the position of Captain of the Patrol Division in 2017, which he held until his final day of employment with the City on September 30, 2020. *Id.*; (Dkt. 69-2 at ¶ 91; Dkt. 75 at ¶ 91). Under the City's Personnel Rules in effect during 2019 and 2020, police captains were considered "for cause" employees. (Dkt. 69-2 at ¶ 17; Dkt. 75 at ¶ 17).

In 2019 and 2020, captains in the police department operated under a Memorandum of Understanding (MOU) that exempted them from most personnel rules and specified that they would be subject to disciplinary action by the chief of police. (Dkt. 69-2 at ¶ 16; Dkt. 75 at ¶ 16). In the summer of 2019, Brainard and Captain Dave

---

[1] The parties have consented to proceed before a United States Magistrate Judge in this matter pursuant to 28 U.S.C. § 636(c)(1) and Local Civil Rule 72.1(a)(1). (Dkt. 9).

[2] Consistent with the standard on summary judgment, the factual background is written to reflect that all evidence in the record is construed in a light most favorable to the non-moving party, who is also given the benefit of all reasonable inferences which can be drawn from that evidence.

[3] Throughout this Order, the ECF docket numbers will be used when citing to the record. Where the parties have submitted duplicative copies of the same document, e.g., certain deposition testimony, the Court will cite to only one of the copies for ease of reference and consistency.

Hagar negotiated with City Administrator Troy Tymesen and the City Director of Human Resources Melissa Tosi regarding the MOU, and Hagar recorded some of these meetings. (Dkt. 69-2 at ¶ 53; Dkt. 75 at ¶ 53). In September 2019, Hagar filed a personnel complaint against Tymesen, alleging retaliation for pausing negotiations on a new MOU that would affect police captains. (Dkt. 69-2 at ¶¶ 53, 55; Dkt. 75 at ¶¶ 53, 55). Randy Adams, the City Attorney for Coeur d'Alene, was assigned to investigate Hagar's complaint against Tymesen.[4] (Dkt. 69-2 at ¶ 55; Dkt. 75 at ¶ 55).

During Adams' internal investigation into Hagar's complaint, he interviewed Brainard and Hagar. (Dkt. 69-2 at ¶ 56; Dkt. 75 at ¶ 56). Prior to his interview, Hagar told Brainard that if he were asked about the recordings of the meetings, Brainard should say there are no recordings, because Hagar had since deleted them. *Id.* In his interview, Brainard testified truthfully to Adams that Hagar had recorded the meetings. (Dkt. 69-2 at ¶ 57; Dkt. 75 at ¶ 57). After the interview, Brainard told Hagar and Police Chief Lee White what he was asked and that he had testified truthfully. *Id.* Hagar and White expressed disappointment in Brainard for having told the truth in the investigation. (Dkt. 1 at ¶ 14). Following the conclusion of the investigations, White and Hagar received letters of expectations, addressing issues including the need to be a team player, accept decisions from the administration, stop audio recordings of employees without consent, and work cooperatively with City departments. (Dkt. 69-2 at ¶ 58; Dkt. 75 at ¶ 58).

---

[4] In the fall of 2019, an outside investigator was hired to conduct two additional investigations: 1) investigating complaints by Police Chief White against City Attorney Mike Gridley, and 2) investigating complaints by Gridley against White. (Dkt. 69-2 at ¶ 54; Dkt. 75 at ¶ 54).

Thereafter, Brainard noticed immediate distinct differences in how White interacted with him, including more subjective feedback, retroactive changes in direction, and isolation at the police department. (Dkt. 69-2 at ¶ 61; Dkt. 75 at ¶ 61). For instance, beginning in November 2019, Plaintiff was excluded from patrol meetings with his lieutenants by White and Hagar, and from more informal check-in meetings with White and Hagar. (Dkt. 69-2 at ¶ 64; Dkt. 75 at ¶ 64; Dkt. 80 at ¶ 6).

In a December 2019 performance evaluation, White rated Brainard "Above Average" overall, but downgraded his performance in six categories from previous evaluations and included areas of improvement that White considered Brainard deficient. (Dkt. 69-1 at ¶ 23; Dkt. 75 at ¶ 23). Brainard contends such deficiencies were overblown or fabricated. The Brainards also claim they were excluded from the law enforcement table at the City's annual Christmas party, on December 6, 2019, where, in years past, they would have joined White and his wife. (Dkt. 69-1 at ¶ 63; Dkt. 75 at ¶ 63).

In the spring of 2020, Brainard spoke to former Mayor Steve Widmyer about the retaliation he was facing from White. (Dkt. 69-1 at ¶ 71; Dkt. 75 at ¶ 71). Thereafter, Brainard had multiple meetings with City officials about White's behavior toward him and other city officials. (Dkt. 69-1 at ¶ 72; Dkt. 75 at ¶ 72).

White encouraged Brainard to take early retirement on at least one occasion, despite being advised by HR director Tosi that Brainard was not a preferred candidate for the City's early retirement program. (Dkt. 75 at ¶ 67; Dkt. 76 at 273–74; Dkt. 76 at 28). Tosi also advised White against putting Brainard on a performance improvement plan (PIP) shortly after his performance evaluation. (Dkt. 69-5 at 50; Dkt. 69-2 at 73; Dkt. 75

at ¶ 73; Dkt. 76 at 21). On June 3, 2020, White and Brainard met for a counseling meeting with Tosi where White expressed his performance expectations to Brainard and identified several issues of concern. (Dkt. 69-2 at ¶ 73; Dkt. 75 at ¶ 73; Dkt. 76 at 224–34). Again, Brainard viewed the examples as either fabricated or overblown. (Dkt. 80 at ¶ 38). The meeting ended with White reading from the PIP he had prepared for Brainard and giving him a letter of expectations. (Dkt. 76 at 224–34).

The next day, Brainard complained to City officials that White had become overly critical of his performance in retaliation for his participation in the Adams investigation, and told them he had become physically ill from the stress. (Dkt. 69-2 at ¶ 74; Dkt. 75 at ¶ 74; Dkt. 80 at ¶ 38). Although Brainard did not file a formal written complaint, the City consulted with its insurer, which recommended an outside investigation be conducted. (Dkt. 69-2 at ¶¶ 75–77; Dkt. 75 at ¶¶ 75–77). Attorney Kirk Naylor was selected and began to investigate Brainard's claims as well as White's working relationships with other City department heads and outside agencies. (Dkt. 69-2 at ¶ 78; Dkt. 75 at ¶ 78). White was informed of the investigations in a memorandum sent by Tymesen on June 29, 2020, which advised White to cooperate with the investigations and not to take corrective or disciplinary action against senior members of the department without involving Tymesen. (Dkt. 69-2 at ¶ 81; Dkt. 75 at ¶ 81).

Ultimately, Naylor's investigative report into Brainard's complaints found "a pattern that Chief White's opinion and performance evaluation of Brainard has deteriorated significantly since Fall 2019. . . . While a retaliation claim is most often devoid of direct evidence, circumstantial evidence appears to at least support a retaliation

claim." (Dkt. 76 at 200–20; Dkt. 69-2 at 83). The report contained a detailed analysis of each performance issue that White identified, finding they were not "significant, articulable performance issues requiring the type of response given," and concluded "since December 2019, it seems there is a pattern of finding, if not looking for performance deficiencies in Brainard by White." *Id.* Adams provided the full report to Brainard on August 4, 2020. (Dkt. 69-2 at 83; Dkt. 75 at 83). Brainard responded in an email on August 5, 2020, summarizing additional perceived retaliation he had faced, expressing his disappointment in the lack of protection he had received from the City, and ultimately stating:

> If the decision is made to retain Lee White as an employee and simply put him on a last chance agreement, I have no intention of requesting that the decision be different. However, it will not be possible for me to, nor should it be reasonably expected that I continue to tough it out and work for him.

(Dkt. 76 at 237); *see also* (Dkt. 69-2 at 83; Dkt. 75 at 83). Brainard did not receive a response to his concerns. (Dkt. 75 at ¶ 83; Dkt. 76 at 316–18).

At all relevant times, the city administrator was Tymesen. (Dkt. 69-2 at ¶¶ 5, 13–14; Dkt. 75 at ¶¶ 5, 13–14). As such, Tymesen had sole authority to terminate department heads, including White. *Id.* On August 13, 2020, Tymesen told White that he would not be fired, that the City Council did not have a say in the matter, and that the upcoming City Council meeting was to inform the City of the results of Naylor's investigation. (Dkt. 69-5 at 148-Dkt. 69-2 at ¶ 84; Dkt. 75 at ¶ 84). On August 18, 2020, the City Council met in an executive session and reviewed Naylor's presentation of his

investigation results. (Dkt. 69-2 at ¶ 85; Dkt. 75 at ¶ 85). Tymesen viewed the meeting as a way to get the Council up to speed and to get their input. (Dkt. 69-5 at 149).

The following day, on August 19, 2020, Brainard met with Tosi, Tymesen, Adams, and Gridley to express his disappointment in the lack of action against White and to express his ongoing concerns regarding continuing harassment and retaliation, as well as his physical manifestations of symptoms. (Dkt. 69-2 at ¶ 88; Dkt. 75 at ¶ 88). Brainard informed the City leaders he felt he had no choice but to retire rather than return to work with White. Gridley placed Brainard on paid administrative leave until his announced retirement in September. (Dkt. 75 at ¶ 88; Dkt. 80 at ¶ 55).

On September 28, 2020, Tymesen sent Brainard a letter, asking him to reconsider retirement and stating the City would protect him if he returned to work. (Dkt. 69-2 at 90; Dkt. 75 at 90; Dkt. 69-5 at 23–24). Brainard rejected the offer because he did not trust the City or believe circumstances had changed such that he would now be protected when the City had failed him in the past. *Id.* Brainard was on administrative leave until September 30, 2020, the day of his retirement. (Dkt. 69-2 at ¶ 91; Dkt. 75 at ¶ 91).

On February 15, 2021, the Brainards filed a claim against the City of Coeur d'Alene, Idaho. (Dkt. 1). Brainard alleges he suffered harassment and retaliation by White, and was constructively discharged, stemming from his participation in the Adams investigation. *Id.* at 4–9. After the Joint Stipulation for Partial Dismissal (Dkt. 64), four claims remain: (Claim 1): a claim for a violation of Procedural Due Process, pursuant to 42 U.S.C. § 1983; (Claim 3): a State Law Whistleblower Claim pursuant to Idaho Code § 6-2101; (Claim 6): a state tort law claim for negligent infliction of emotional distress; and

(Claim 7): a state tort law claim for loss of consortium comfort, and society. Defendant moves for summary judgment on all claims. (Dkt. 69).

## STANDARD OF LAW

Summary judgment is appropriate where a party demonstrates that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is a fact "that may affect the outcome of the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact and a favorable judgment is due as a matter of law. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating whether the moving party has met this burden, the Court views the evidence in the light most favorable to the non-moving party and the Court must not make credibility findings. *Anderson*, 477 U.S. at 255. If the moving party satisfies its initial burden, the non-moving party must identify facts sufficient to show a genuine issue for trial to defeat the motion for summary judgment. *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000). The non-moving party must go beyond the pleadings and show "by…affidavits, or by the depositions, answers to interrogatories, or admissions on file," that a genuine dispute of material fact exists. *Celotex*, 477 U.S. at 324. The Court must grant summary judgment if the non-moving party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

## DISCUSSION

### 1.    Evidentiary Objections

The City's sur-reply raises evidentiary objections to Brainard's evidence. (Dkt. 90). The Court has previously determined most of the City's evidentiary objections will not be considered at summary judgment because they are untimely or are outside the scope of the sur-reply granted by the Court. (Dkt. 94). The remaining evidentiary objections are objections to the Expert Witness Report of Roger Lanier (Dkt. 81) on the basis of inadmissible hearsay; and objections to ten audio exhibits included with the second untimely declaration of Brainard's counsel (Dkt. 85), on the basis of inadmissible hearsay and improper authentication. (Dkt. 90). Brainard's counsel has since attempted to verify the authenticity of the audio exhibits. (Dkt. 96).

In the context of a summary judgment, a district court must "rule on evidentiary objections that are material to its ruling." *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010). "An evidentiary objection is material to the district court's ruling if the court considered the evidence that was the subject of the objection." *Roberts v. Albertson's LLC*, 464 F.App'x 605, 606 (9th Cir. 2011). A court does not need to rule on objections that are not material to the court's ruling on summary judgment. *Id.* at 606–07.

Here, the Court need not consider the Lanier Report and the ten audio exhibits to rule on summary judgment. Therefore, the evidentiary objections thereto are not material,

and the Court need not address them.[5] Accordingly, the City's remaining objections (Dkt. 90) are overruled at this juncture, and Plaintiff's pending motion (Dkt. 96) is denied as moot as it relates to these objections.

### 2.    Count One: Procedural Due Process

Brainard's first claim, pursuant to 42 U.S.C. § 1983 (Section 1983), alleges that his constitutional right to procedural due process was violated when he was constructively discharged by the City without an adequate post-deprivation hearing. (Dkt. 1 at 10–11).

Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). A Section 1983 claim based upon procedural due process contains two elements: (1) a deprivation of liberty or property interest protected by the Constitution; and (2) a denial of adequate procedural protections. *See Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.,* 149 F.3d 971, 982 (9th Cir.1998). If a property interest exists, the essential

---

[5] Even if the Court entertained these objections, the admissibility standard at summary judgment is different than at trial. Under Federal Rule of Civil Procedure 56(c)(2), if the contents of the proffered evidence could be presented in an admissible form at trial, then the contents may be considered on summary judgment. *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The Court notes Lanier could present the report's contents through his testimony at trial. Further, there are numerous permissible avenues for authenticating the audio exhibits at issue, including if they were produced in discovery by the party-opponent. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 777, n.20 (9th Cir. 2002) (collecting cases and citing 31 *Federal Practice & Procedure: Evidence* § 7105, at 39 ("Authentication can also be accomplished through judicial admissions such as ... production of items in response to ... [a] discovery request.")). The Court notes the City provided the audio recordings, to which it now objects, to the Brainards in discovery.

requirements of due process are notice and an opportunity to respond. *See Cleveland Bd. of Educ. v. Loudermill et al.,* 470 U.S. 532, 546 (1985).

Here, it is undisputed that as a police captain, Brainard was a public employee who could only be terminated for-cause and therefore had a protected property interest in his continued employment with the City. (Dkt. 69-1 at 5; Dkt. 69-2 at ¶ 17; Dkt. 75 at ¶ 17). The Court must determine, therefore, whether Brainard can establish the deprivation of such a property interest through constructive discharge, and even if he can, whether there is a theory of municipality liability that would allow him to recover from the City.

### a.    Constructive Discharge

The first question before the Court is whether there is a triable issue of fact as to whether the City constructively discharged Brainard by making working conditions so intolerable that a reasonable employee in his position would have felt forced to resign.

In the Ninth Circuit, constructive discharge occurs when, looking at the totality of circumstances, an employee reasonably decides to resign "because of unendurable working conditions." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). Indeed, conditions must have deteriorated "to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Id.* (quoting *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). "The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citation omitted). The plaintiff "need not

show that the employer subjectively intended to force the employee to resign." *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987). Demotions, pay cuts, unwarranted discipline, and encouragement to resign or retire may support a claim for constructive discharge. *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1411–12 (9th Cir. 1996).

Though constructive discharge is normally a question of fact for the jury, "a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge." *Watson*, 823 F.2d at 362. *See also Schnidrig*, 80 F.3d at 1411–12 (citing *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990)). "[E]vidence of transfer and demotion," *Poland*, 494 F.3d at 1184, that an employee's "managerial responsibilities were reduced," *Huskey v. City of San Jose*, 204 F.3d 893, 901 (9th Cir. 2000), or that his workload was reduced, alone are insufficient, as a matter of law, to establish constructive discharge. *Burch v. City of Chubbuck*, 146 F. 4th 822, 838 (9th Cir. 2025) (finding an employee who maintained 70–80% of his full-time position and who had no negative interactions with the supervisor complained of during the reduction was not constrictively discharged).

Instead, a plaintiff "must show some aggravating factors, such as a continuous pattern of discriminatory treatment" to prevail on a constructive discharge claim. *Sanchez*, 915 F.2d at 431 (cleaned up). For example, the Ninth Circuit has "upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." *Watson*, 823 F.2d at 361. While a pattern of hostile and discriminatory treatment must exist at the time of the employee's resignation, evidence that working conditions somewhat improved, but were not abated at

the time of resignation, is insufficient to preclude constructive discharge. *Wallace v. City of San Diego*, 479 F.3d 616, 626–27 (9th Cir. 2007).

Brainard contends White's "nine-month campaign of retaliation and harassment toward Plaintiff," coupled with the City's decision to not terminate White and instead place Brainard on administrative leave, left him with no choice but to retire rather than return to such an egregious working environment. (Dkt. 84 at 15–16). In moving for summary judgment, the City argues that (1) Brainard's retirement was voluntary and cannot as a matter of law amount to constructive discharge, and (2) that Brainard did not give the City a reasonable opportunity to resolve the problems before deciding to retire. (Dkt. 69-1). As described below, the Court disagrees with each of the City's arguments.

First, viewing the facts in the light most favorable to Brainard, there are a series of instances that span from November 2019 to August 2020 from which a reasonable fact finder could conclude, looking at the totality of the circumstances, that White retaliated against Brainard for testifying truthfully in the Adams investigation and caused Brainard's employment conditions under White to became so intolerable and discriminatory as to compel a reasonable employee in his position to take early retirement. Taken together, these actions included: singling Brainard out with overblown and fabricated criticism; finding or soliciting information regarding performance deficiencies; subjecting him to unwarranted discipline in the form of a PIP and letter of expectations; encouraging him to take early retirement; excluding him from patrol and leadership meetings; isolating him in the department; and the removal of certain duties. The Naylor report supports this conclusion.

Naylor concluded that White looked for deficiencies to justify disciplining Brainard, and that certain instances were "deliberately orchestrated," and even "petty and unnecessary." (Dkt. 76 at 218). While Naylor suggests these issues may have been easily resolved through counseling, the record reveals otherwise, as the parties participated in a counseling session that White instead used to reprimand Brainard and read the PIP and letter of expectations to him, despite being advised against it. (*See* Dkt. 69-2 at 73; Dkt. 75 at ¶ 73; Dkt. 76 at 24-26, 212, 224–34). Further, Brainard asserts that White repeatedly encouraged him to retire early, despite being advised against it by Tosi. (Dkt. 75 at ¶ 67; Dkt. 76 at 273; Dkt. 76 at 28). Brainard also claims that White removed certain of his duties, including communication with City officials, supervision of the patrol unit, and participation in certain meetings. (Dkt. 69-2 at ¶ 64; Dkt. 75 at ¶ 64; Dkt. 80 ¶ 6). Brainard reported his physical symptoms from seemingly being unable to meet White's newly heightened expectations to City officials in the spring of 2020. (Dkt. 69-2 at ¶¶ 71, 72; Dkt. 75 at ¶¶ 71, 72; Dkt. 80 at ¶ 50).

After the conclusion of the Naylor investigation, Brainard again expressed his concerns of continued harassment and retaliation on August 5, 2020. (Dkt. 76 at 236). Thereafter, Tymesen decided not to discipline or terminate White, and instead determined that oral discussions with White regarding the situation were sufficient. (Dkt. 76 at 313–15). Upon learning that he would have to continue working under White, Brainard met with and told City officials that he felt he had no choice but to retire. (Dkt. 69-2 at ¶ 88; Dkt. 75 at ¶ 88). During this meeting, Brainard was placed on administrative leave and thereafter did not return to work. *Id.*

In all, these facts could reasonably support a jury finding Brainard was constructively discharged based on a pattern of harassment and retaliation by White that spanned a period of at least nine months and that was not mitigated by the time Brainard was placed on administrative leave or took early retirement.

Second, the City contends that Brainard is unable to support a constructive discharge claim because he "made it clear . . . he would not remain employed at the Police Department, irrespective of any measures the City might take to address his concerns." (Dkt. 69-1 at 9). The City relies on *Poland* for the proposition that an "employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* (quoting *Poland*, 494 F.3d at 1185). In *Poland*, the Ninth Circuit explained that the bar for constructive discharge claims is set "high" because the underlying policies are "better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland*, 494 F.3d at 1184–85 (citing *Tidwell v. Meyer's Bakeries, Inc.,* 93 F.3d 490, 494 (8th Cir.1996)).

Here, the record reflects that Brainard gave the City a reasonable opportunity to work out the problems he complained of. Brainard first complained to City officials in the spring of 2020. He participated with White in a counseling session related to his concerns. During that session, and despite the City HR director warning White against putting Brainard on a PIP, White effectively did so by reading from the PIP he prepared and following up with a letter of expectations for Brainard. Brainard again brought his

concerns to the City, and an internal investigation was initiated. Despite the investigation's finding that White was likely retaliating against Brainard, no action was taken against White. Rather, when Brainard came to the City following the final decision not to take action against White, the City placed Brainard on administrative leave until he could take early retirement. These facts could reasonably support a jury finding that Brainard did not leave his employment without giving his employer a reasonable opportunity to correct the issues, and that he repeatedly asked for assistance and left only after it was clear none would be given.

Accordingly, the Court finds Brainard has established triable issues of fact as to whether his working conditions amounted to constructive discharge under claim one.

### b.    *Monell* Liability

Even if a genuine issue of fact exists regarding whether there was constructive discharge, the City argues that Brainard cannot establish municipal liability against the City. (Dkt. 69-1 at 10).

A municipality can only be held liable in a Section 1983 claim when a constitutional deprivation was directly caused by a municipal policy, statement, ordinance, regulation, decision, or custom officially adopted and promulgated by that body's officers. *Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 690–91 (1978). A municipality may be held liable under *Monell* through three theories of liability: (1) when an official policy or established custom inflicts a constitutional injury; (2) when acts or omissions amount to a policy of deliberate indifference to a constitutional right; or (3) when an official with final policy-making authority ratifies a

subordinate's unconstitutional conduct. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010), *overruled in part on other grounds by Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc).

At the summary judgment hearing, Brainard confirmed that he is asserting the third theory of municipality liability to establish the *Monell* claim; specifically, he argues the City is liable because it, through Tymesen's failure to discipline or terminate White, ratified White's unconstitutional retaliatory conduct. (Dkt. 99; TR 11:20:50-11:22:45)[6]; (Dkt. 84 at 20–21) ("Plaintiffs are asserting that Mayor Widmyer and Tymesen, as city officials with final decision making authority, ratified Chief White's retaliatory actions and failed to stop the retaliation."). Thus, Brainard must adduce evidence to create a triable issue of fact that (1) Tymesen was an official with final policy-making authority in regard to employment policy, and (2) that Tymesen's decision to not discipline or terminate White ratified White's conduct.

First, "[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). Whether an official possesses policy-making authority is a question of state law, and such authority may be bestowed by law or delegated by an official possessing such authority under state law. *Id.* at 483; *see also City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988). The identification of final policy-making authority is a "legal question to be resolved by the trial judge *before* the case is

---

[6] Docket 99 refers to the minute entry for the December 17, 2025, summary judgment hearing. TR refers to the recording of the hearing.

submitted the jury." *Jett v. Dallas Independent School District*, 491 U.S. 701, 737 (1989) (emphasis in original). As the Court in *Praprotnik* and the plurality in *Pembaur* noted, "special difficulties can arise when it is contended that a municipal policymaker has delegated his policymaking authority to another official." *Praprotnik*, 485 U.S. 126 (citing *Pembaur*, 475 U.S. at 482–83, and n. 12). "Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of authority to make policy." *Praprotnik*, 485 U.S. at 130.

Here, during the time at issue, the City's personnel rules were approved, adopted, and amended by the City Council. (Dkt. 69-2 at ¶ 11; Dkt. 75 at ¶ 11). Those personnel rules prohibited workplace discrimination, retaliation, and harassment. (Dkt. 69-2 at ¶ 15; Dkt. 75 at ¶ 15; Dkt. 76 at 207–08). Therefore, the City Council had policy-making authority in regard to employment policy. The question here is whether the City Council delegated its policymaking authority to Tymesen, the City Administrator, who decided not to discipline or terminate White.

Most relevant here, in *Pembaur*, the Supreme Court explained that where an official's discretionary decisions are constrained by policies not of that official's making—such as a Sheriff exercising discretion to hire and fire employees as per an employment policy created by a board or commission—only the board or commission could be the policymaker who opens the door to § 1983 municipal liability. *Id.* at 483 n.12. In that example, the Sheriff's exercise of discretion—even if unconstitutional— would not expose the County to liability if the policy set by the board was otherwise constitutional. *Id.* The Ninth Circuit has interpreted this to mean an official may be found

to have been delegated final policy making authority when the official's discretionary decision is unconstrained by policies not of that official's making and unreviewable by the municipality's authorized policymakers. *Lytle v. Carl*, 382 F.3d 978, 984 (9th Cir. 2004) (citing *Christie v. Iopa*, 176 F.3d 1231, 1236-37 (9th Cir. 1999)).

Tymesen's authority emulates the example articulated in *Pembaur*. The personnel rules provided that Tymesen, as the City Administrator, supervised department heads, including the police chief, and had the authority to terminate department heads after consulting with human resources and the city attorney. (Dkt. 69-2 at ¶¶ 13–14). Brainard points to no evidence indicating Tymesen's discretion was unconstrained by the City Council's policies. Like in the *Pembaur* example, Tymesen exercised his discretion per the personnel rules created by the City Council. Accordingly, because Tymesen's discretion was constrained by policies not of his own making, Tymesen was not a final policymaker.

That Tymesen's discretionary authority was unreviewable by the City Council does not change this analysis. The complete personnel rules in effect in 2019 and 2020 were not provided to the Court, but deposition testimony regarding them was. According to that testimony, the only person with authority to override the City administrator's decision regarding termination of a department head was the mayor, who could make a final decision if a department head appealed their termination. (Dkt. 69-5 at 33). Without an appeal, the City administrator's decision was final. The City Council did not have a

formal role in termination of a department head. [7] (Dkt. 69-2 at ¶¶ 13–14). Although it appears Tymesen's discretionary decisions were unreviewable by the City Council, based on the relevant precedent, the Court finds he did not have policy-making authority because his discretion was still constrained by the City Council's employment policies.

Even if Tymesen can be considered final policymaker through delegation of the City Council's policy-making authority, Brainard cannot establish ratification because he points to no facts to support Tymesen made a conscious, affirmative choice to approve White's actions and adopt them as official policy.

"Ordinarily, ratification is a question for the jury." *Christie*, 176 F.3d at 1238–39. As with any jury question, however, "plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred." *Id.* at 1239. To show ratification, a plaintiff must prove the "authorized policymakers [approved] a subordinate's decision and the basis for it." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (citing *Praprotnik*, 485 U.S. at 127); *accord Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). "[T]hat a policymaker's mere refusal to overrule a subordinate's

---

[7] Brainard acknowledges that the personnel rules give sole authority to the City Administrator to terminate department heads, but still disputes this statement of fact, arguing "in reality the mayor always wanted the city council involved in making the decision . . . that is what happened when City administrator Troy Tymesen grappled with whether to terminate Chief White – he passed the buck to the mayor, and the mayor then passed the buck to the city council." (Dkt. 75 at ¶ 13). This argument is inapposite to Brainard's position that Tymesen was delegated final policy-making authority by the City Council, and it is otherwise unsupported by the record. *See* (Dkt. 69-2 at ¶¶ 84–85; Dkt. 75 at ¶¶ 84–85; Dkt. 69-5 at 149). The record reflects that Tymesen decided not to fire White prior to the City Council meeting, and the Council was merely apprised of the results of the investigative report. As discussed, "[s]imply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of authority to make policy." *Praprotnik*, 485 U.S. at 130. As such, this is insufficient to create a genuine dispute at summary judgment.

completed act does not constitute approval," however, is well-settled. *Christie*, 176 F.3d at 1239. *Praprotnik,* 485 U.S. at 126 (observing that "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior* liability").

Likewise, the Ninth Circuit "appears to require something more than a failure to reprimand to establish a municipal policy or ratification." *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003). *See also Irvine v. Cook*, No. 4:22-CV-00218-AKB, 2024 WL 310082 (D. Idaho Jan. 25, 2024). In *Lytle*, the Ninth Circuit found municipality liability through ratification where there was evidence the policymaker "approved of the retaliatory acts . . . rather than simply failed to overrule them." *Lytle*, 382 F.3d at 988.

Here, Brainard has not identified evidence establishing a genuine issue regarding ratification. The Court struggles to distinguish Brainard's argument for municipal liability from that of an argument of *respondeat superior* liability, which is insufficient under *Monell*. Brainard points to no evidence indicating that Tymesen's discretionary decision not to terminate or discipline White was a ratification of White's retaliatory behavior. In fact, the record indicates otherwise. The City conducted an investigation into White's conduct, then, Tymesen exercised his discretion to decide how to address the situation. Further, Brainard does not point to evidence establishing "something more" than a failure to reprimand or approval of the alleged retaliation. *See Kanae*, 294 F. Supp. 2d at 1189. Absent such evidence, the Court cannot, under the relevant precedent, find

municipal liability under the *Monell* doctrine. *Christie*, 176 F.3d at 1239. Accordingly, the Defendant's Motion for Summary Judgment is granted as to Count One.[8]

### 3.    Count Three

In his third claim for relief, Brainard alleges a state law whistleblower claim in violation of the Idaho Protection of Public Employees Act (the IPPEA), pursuant to Idaho Code § 6-2101. (Dkt. 1 at 14).

"The IPPEA seeks to protect the integrity of the government 'by providing a legal cause of action for public employees who experience adverse action from their employer as a result of reporting waste and violations of a law, rule or regulation.'" *Patterson v. State, Dept. of Health & Welfare*, 256 P.3d 718, 724 (Idaho 2011) (quoting *Van v. Portneuf Med. Ctr.*, 212 P.3d 982, 987 (2009)). "To prevail in an action" under the IPPEA, Brainard must establish that he "suffered an adverse action because" he engaged, or intended to engage, in whistleblower activity. Idaho Code § 6-2105(4). "Under Idaho's Whistleblower Act, a *prima facie* case for retaliatory discharge requires [the plaintiff] to show: "(1) he was an employee who engaged or intended to engage in protected activity; (2) his employer took adverse action against him; and (3) the existence of a causal connection between the protected activity and the employer's adverse action." *Van*, 212 P.3d at 988 (internal quotations omitted).

---

[8] Because Claim One is the only remaining federal claim, the Court would be within its discretion to stop the analysis here and decline to continue exercising its supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(c)(3); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639–40 (2009). However, given the length of the litigation in this case and the potential prejudice to the Brainards if it were to decline to exercise jurisdiction over the remaining state law claims, the Court will exercise its discretion to retain the remaining state claims on the basis of supplemental jurisdiction.

Here, the parties do not dispute, and the Court finds, that Brainard engaged in a protected activity when he participated in the Adams investigation. (Dkt. 1 at 14; Dkt. 69-1 at 14–15). Nonetheless, the City argues this claim fails as a matter of law because Brainard's decision to retire does not amount to an adverse employment action sufficient to satisfy the second element of his IPPEA claim. (Dkt. 69-1 at 14).

### a.    Adverse Action

The second element of a whistleblower claim under the IPPEA requires the plaintiff adduce evidence that the employer took adverse action against him. *Van*, 212 P.3d at 988. "Adverse action" is defined as "to discharge, threaten or otherwise discriminate against an employee in any manner that affects the employee's employment, including compensation, terms, conditions, location, rights, immunities, promotions or privileges." Idaho Code § 6-2103(1). Constructive discharge is considered an adverse action under the IPPEA, subject to the same objective standard as federal claims. *Waterman v. Nationwide Mut. Ins. Co.*, 201 P.3d 640, 673 (Idaho 2009) ("Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?") (quoting *Poland*, 494 F.3d at 1174).

Here, Brainard claims his constructive discharge is the adverse action in this claim. (Dkt. 1 at ¶ 61; Dkt. 84 at 21–22). As described above, Brainard has provided evidence giving rise to a genuine dispute of fact as to whether he was constructively discharged. Accordingly, there is likewise a genuine issue of material fact on Brainard's Whistleblower Act claim. Defendant's Motion for Summary Judgment on Claim Three based on Brainard's failure to suffer an adverse employment action is denied.

b.      **Timeliness**

An employee seeking to bring a Whistleblower action under the IPPEA must do so within 180 days after the occurrence of the alleged violation. Idaho Code § 6-2105(2). Since Brainard filed his complaint on February 15, 2021, the adverse employment action that forms the basis of the IPPEA claim must not have occurred more than 180 days beforehand – *i.e.,* August 19, 2020. *Burch v. City of Chubbuck*, 146 F.4th 822, 840 (9th Cir. 2025). In *Burch*, the Ninth Circuit upheld summary judgment on an IPPEA claim, without reaching the merits, because it was untimely. *Id.* In reaching this decision, the Court noted "the only way that [Plaintiff's] claim is not time-barred is if his . . . notice of resignation . . . preserved his claim that the adverse employment actions amount to constructive discharge." *Id.* After deciding the plaintiff in that case could *not* establish a genuine issue of material fact regarding constructive discharge, the Court upheld summary judgment based on the statute of limitations "because none of the adverse employment actions occurred within the statute of limitations." *Id.*

Here, unlike in *Burch*, the Court has found that there is a genuine issue of material fact as to whether Brainard was constructively discharged. Therefore, the date of the constructive discharge itself, rather than the date of the discrete alleged adverse employment actions, is operative for determining the limitations period. *Id*.

Nevertheless, the City argues the claim is time-barred because Brainard provided notice of his intent to resign prior to August 19, 2020. (Dkt. 69-1 at 15–16). When asked in his deposition whether he expressed to the City that he was going to retire after the City Council meeting, Brainard responded: "[t]hat wasn't the first time I had brought that

up, but yes, I did discuss that on that date." (Dkt. 69-5 at 394). The City contends this statement sufficiently demonstrates Brainard's decision to retire was made and unequivocally communicated to the City prior to August 19, 2020, and therefore this claim is untimely. (Dkt. 69-1 at 15–16).

A claim based on constructive discharge under the IPPEA can arise when the employee provides unequivocal notice of their intent to resign. *Patterson v. State, Dept. of Health & Welfare*, 256 P.3d 718, 725 (Idaho 2011). In *Patterson*, the Supreme Court of Idaho determined the date an employee gave definite notice of her intent to resign because of unbearable working conditions was the operative accrual date for the 180-day limitation period, even though the resignation did not become effective until two weeks later. *Id.* ("[T]he accrual of the constructive discharge claim is based on when the work environment became unbearable for the employee, not when the employer believed she was no longer employed there."). In that case, the employee "turned in her keys and badge and did not return to work" after giving the notice. *Id.* Critically, the Court reasoned the employer, therefore, "was in no position to subject her to additional discriminatory treatment after that date." *Id.*

Here, Brainard gave unequivocal notice of his intent to take early retirement on August 19, 2020, when he met with the City administrators. Prior to that, Brainard had stated his frustrations with the City's response to his complaints and had stated in an email that "if the decision is made to retain Lee White as an employee and simply put him on a last chance agreement, I have no intention of requesting that the decision be different. However, it will not be possible for me to, nor should it be reasonably expected

that I, continue to tough it out and work with him." (Dkt. 76 at 237). This statement is not an unequivocal notice of his intent to retire; indeed, it is, by definition, equivocal, as it was dependent on the City's decision regarding White's discipline.[9] As discussed in the analysis of Claim One, whether Brainard gave the City a reasonable opportunity to remedy the issues complained of is genuinely disputed.

Brainard met with City administrators on August 19, 2020, and told them that he felt he had to take early retirement due to the lack of action taken by the City to protect him. The City placed him on paid administrative leave, which he remained on, until his retirement on September 30, 2020. Based on the foregoing, the operative date of Brainard's constructive discharge is August 19, 2020, both because he provided notice on that date and because he was removed from the workplace.

Accordingly, the Court finds that the IPPEA claim is timely and therefore denies the Motion for Summary Judgment as to Claim Three.

### 4.    Claim 6: Negligent Infliction of Emotional Distress

Brainard's sixth claim for relief alleges a state tort claim for Negligent Infliction of Emotional Distress (NIED) under the Idaho Tort Claims Act (ITCA), which provides a cause of action for common law torts committed by a governmental entity. (Dkt. 1 at 17–19); Idaho Code § 6-903, *et seq.*

In Idaho, a common law claim for NIED requires four elements: "(1) a duty recognized by law requiring the defendant to conform to a certain standard of conduct;

---

[9] Unequivocal is defined as "[u]nambiguous; clear; free from uncertainty." UNEQUIVOCAL, Black's Law Dictionary (12th ed. 2024).

(2) a breach of that duty; (3) a causal connection between the conduct and the plaintiff's injury; and (4) actual loss or damage." *Johnson v. McPhee*, 210 P.3d 563, 574 (Idaho App. 2009) (requiring "some physical manifestation of the plaintiff's emotional injury"). However, the Supreme Court of Idaho has held that "the Whistleblower Act provides statutory remedies which supplant, and thus preclude, common law causes of action." *Eller v. Idaho State Police*, 443 P.3d 161, 169, 171 (2019) ("Because the Whistleblower Act provides a direct remedy for non-economic damages, its statutory cause of action supplants the common law tort for negligent infliction of emotional distress.").

Brainard is precluded from bringing the state common law claim for NIED because, as discussed above, he may pursue a Whistleblower claim in Claim Three, a point conceded by Brainard's counsel at oral argument. (Dkt. 99; TR 11:29:15–11:30:06). Accordingly, the Motion for Summary Judgment is granted as to Claim Six.

### 5.    Claim 7: Loss of Consortium, Comfort, and Society

The seventh claim for relief is a state law loss of consortium claim brought by Mrs. Brainard. (Dkt. 1 at 18).

In Idaho, "[t]he claim for loss of consortium is a wholly derivative cause of action contingent upon a third party's tortious injury to a spouse." *Runcorn v. Shearer Lumber Products, Inc.,* 690 P.2d 324, 329 (1984). Idaho courts consistently hold that a state "loss of consortium claim is necessarily dependent on the injured spouse's success or failure in the underlying claim against the third party." *Lightner v. Hardison,* 239 P.3d 817, 824 (Idaho Ct. App. 2010). Further, the Supreme Court of Idaho has determined the plain language of the Whistleblower Act bars a spouse of a whistleblowing employee from a

loss of consortium claim under the Whistleblower Act. *Berrett v. Clark Cnty. Sch. Dist. No. 161*, 454 P.3d 555, 570 (Idaho 2019) ("There is nothing in the plain language of the Whistleblower Act itself which protects the spouse of a whistleblower. Allowing a common law cause of action outside the Whistleblower Act would undercut the Idaho legislature's attempt to create an exclusive wrongful termination remedy for aggrieved government employees.").

Again, because Brainard brought a Whistleblower claim under the exclusive IPPEA, his tort claim for NIED is precluded as a matter of law. Therefore, Mrs. Brainard's claim for loss of consortium also fails because it is contingent upon the success of the NIED claim and because it cannot be based on the Whistleblower claim. Accordingly, the Motion for Summary Judgment is granted as to Claim Seven.

## ORDER

THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Dkt. 69) is granted in part and denied in part as follows:

1) Defendant's Motion for Summary Judgment is **GRANTED** as to Claims One, Six, and Seven.

2) Defendant's Motion for Summary Judgment is **DENIED** as to Claim Three.

IT IS FURTHER ORDERED that Defendant's remaining evidentiary objections in (Dkt. 90) are **OVERRULED**, and Plaintiffs' pending motion (Dkt. 96) is **DENIED AS MOOT**.

IT IS FURTHER ORDERED that the parties must confer and submit a joint statement as to how they intend to proceed in this matter on Count Three on or before February 9, 2026.

DATED: January 16, 2026

_____
Honorable Debora K. Grasham
United States Magistrate Judge